UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
==========================================X
SARA ELIAS, M.D.,

Plaintiff,

**COMPLAINT**

-against-

RYAN RYAN DELUCA, LLP, JOHN F. COSTA, and
RYAN J. CESARIO,

Defendants.
==========================================X

Plaintiff SARA ELIAS, M.D., by her attorneys, JOSEPH LANNI, ESQ., and THE JACOB D. FUCHSBERG LAW FIRM, L.L.P., as and for her Complaint against the defendants, RYAN RYAN DELUCA, LLP, JOHN F. COSTA, and RYAN J. CESARIO, respectfully alleges, upon information and belief, as follows:

## PARTIES

1. At all times subsequently referenced, plaintiff SARA ELIAS, M.D.,[1] was and is a resident, domicile and citizen of the State of New York.
2. At all times subsequently referenced, plaintiff SARA ELIAS, M.D., resided and still resides at 52 Forest Lake Drive, West Harrison, N.Y. 10604.
3. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP,[2] was and still is a limited liability partnership organized and existing under the laws of the State of Connecticut.
4. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still

[1] Plaintiff Sara Elias is at times variously referred to as "Dr. Elias" throughout this Complaint.
[2] Defendant Ryan Ryan DeLuca LLP is at times variously referred to as "RRD" throughout this Complaint.

is a limited liability partnership with its principal place of business situated in the State of Connecticut.

5. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still is a limited liability partnership with its principal place of business located at 1000 Lafayette Boulevard, Suite 800, Bridgeport, CT 06604.

6. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still is a limited liability partnership whose partners, constituent members, and/or shareholders are all residents, domiciles and citizens of the State of Connecticut[3].

7. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still is a law firm that provides legal services through its attorneys, paralegals and personnel to clients in the State of Connecticut.

8. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still is a limited liability partnership that transacted and still transacts business in the State of Connecticut.

9. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still is a limited liability partnership that conducted and still conducts business operations in the State of Connecticut.

10. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, was and still is a limited liability partnership that derived substantial revenue from services rendered in the State of Connecticut.

---

[3] In fact, all attorneys working at RYAN RYAN DELUCA, LLP, whether partners, counsel or associates, to wit, Michael C Barbarula, John W Cannavino Jr., John F. Costa, Charles A Deluca, Robert O'Hickey, Ryan C. Ing, Michael P. Kamp, Robert C. E. Laney, Charles M. McCaghey, Pamela D. Miller, James J Noonan, Ryan V. Nobile, Ryan J. Roberts, Kieran M. Ryan, Michael T Ryan, Daniel E Ryan, Elizabeth Ryan Lane, Dylan B. Shaw, and Jonathan C Zellner, are residents, domiciles and citizens of the State of Connecticut.

11. At all times subsequently referenced, defendant JOHN F. COSTA[4] was and is a resident, domicile and citizen of the State of Connecticut.
12. At all times subsequently referenced, defendant JOHN F. COSTA resided and still resides at 900 Oak St., Apt. 1114, Stamford, CT 06902.
13. At all times subsequently referenced, defendant JOHN F. COSTA was and still is an attorney duly licensed to practice law in the State of Connecticut.
14. At all times subsequently referenced, defendant JOHN F. COSTA was and still is a partner in defendant RYAN RYAN DELUCA, LLP.
15. At all times subsequently referenced, defendant JOHN F. COSTA was and still is a constituent member of defendant RYAN RYAN DELUCA, LLP.
16. At all times subsequently referenced, defendant JOHN F. COSTA was and still is a shareholder in defendant RYAN RYAN DELUCA, LLP.
17. At all times subsequently referenced, defendant JOHN F. COSTA was and still is an employee of defendant RYAN RYAN DELUCA, LLP.
18. At all times subsequently referenced, defendant JOHN F. COSTA was and still is affiliated as an attorney with defendant RYAN RYAN DELUCA, LLP.
19. At all times subsequently referenced, defendant JOHN F. COSTA was and still is an agent of defendant RYAN RYAN DELUCA, LLP.
20. At all times subsequently referenced, defendant RYAN J. CESARIO[5] was and is a resident, domicile and citizen of the State of Connecticut.
21. At all times subsequently referenced, defendant RYAN J. CESARIO resided and still resides

---

[4] Defendant John F. Costa is at times variously referred to as "Attorney Costa" or "Costa" throughout this Complaint.

[5] Defendant Ryan J. Cesario is at times variously referred to as "Attorney Cesario" or "Cesario" throughout this Complaint.

at 380 Mather St., Apt 6212, Hamden, CT 06514.

22. At all times subsequently referenced, defendant RYAN J. CESARIO was and still is an attorney duly licensed to practice law in the State of Connecticut.

23. At all times subsequently referenced, defendant RYAN J. CESARIO was an employee of defendant RYAN RYAN DELUCA, LLP.

24. At all times subsequently referenced, defendant RYAN J. CESARIO was affiliated with defendant RYAN RYAN DELUCA, LLP.

25. At all times subsequently referenced, defendant RYAN J. CESARIO was an agent of defendant RYAN RYAN DELUCA, LLP.

26. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, is vicariously liable for the wrongful acts and omissions of JOHN F. COSTA, RYAN J. CESARIO, and its employees, agents and affiliated attorneys.

27. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, held itself out to the public as a law firm that could represent clients in legal matters in a competent manner and in accordance with standards of good and accepted legal practice in the community.

28. At all times subsequently referenced, defendant RYAN RYAN DELUCA, LLP, held itself out to the public as a law firm that could represent doctors, hospitals and health care providers in medical malpractice lawsuits in a competent manner and in accordance with standards of good and accepted legal practice in the community.

29. At all times subsequently referenced, defendant JOHN F. COSTA was and still is authorized by defendant RYAN RYAN DELUCA, LLP, to provide legal services to clients on behalf of the law firm.

30. At all times subsequently referenced, defendant JOHN F. COSTA held himself out to the public as an attorney who could represent clients in legal matters in a competent manner and in accordance with standards of good and accepted legal practice in the community.

31. At all times subsequently referenced, defendant JOHN F. COSTA held himself out to the public as an attorney who could represent doctors, hospitals and health care providers in medical malpractice lawsuits in a competent manner and in accordance with standards of good and accepted legal practice in the community.

32. At all times subsequently referenced, defendant RYAN J. CESARIO was authorized by defendant RYAN RYAN DELUCA, LLP, to provide legal services to clients on behalf of the law firm.

33. At all times subsequently referenced, defendant RYAN J. CESARIO held himself out to the public as an attorney who could represent clients in legal matters in a competent manner and in accordance with standards of good and accepted legal practice in the community.

34. At all times subsequently referenced, defendant RYAN J. CESARIO held himself out to the public as an attorney who could represent doctors, hospitals and health care providers in medical malpractice lawsuits in a competent manner and in accordance with standards of good and accepted legal practice in the community.

**JURISDICTION**

35. The subject matter jurisdiction of this Court is premised upon the diversity of citizenship of the parties as the plaintiff is a resident, domicile and citizen of the State of New York, the defendant law firm is organized, existing and operating under the laws of the State of Connecticut with principal and actual places of business in the state, the defendant law firm's partners are all residents, domiciles and citizens of the State of Connecticut who are licensed

attorneys in the state and represent clients here, and the two individual defendant attorneys are residents, domiciles and citizens of the State of Connecticut who are licensed attorneys in the state and represent clients here.

36. Moreover, the matter in controversy exceeds, exclusive of interest and costs, the sum specified by *28 U.S.C. §1332* (*i.e.:* $75,000.00).

**VENUE**

37. The venue of this action is premised upon the defendants' transactions, acts, omissions, and conduct that form, in pertinent part, the factual basis of the causes of action in plaintiff's Complaint having occurred in the State of Connecticut.

**JURY DEMAND**

38. Plaintiff demands trial by jury of all issues presented in this action that are triable by a jury as of right pursuant to the applicable statutes and court rules.

**SYNOPSIS**

39. This action involves a series of wrongful acts and omissions by the defendants that encompasses departures and deviations from standards of good and accepted legal practice, unethical conduct, misfeasance, malfeasance, deceptive business practices, negligence, carelessness, recklessness and willful dereliction of responsibility in their representation of plaintiff SARA ELIAS, M.D., in a medical malpractice action resulting in her injuries, damages, harm and losses.

40. It is claimed that the defendants' wrongful acts, omissions and conduct in the course of their representation of Dr. ELIAS in that case were, in pertinent part, motivated by elevating and promoting their business interests and purposefully disregarding, neglecting, ignoring and spurning her best interests.

41. It is further claimed that the defendants' egregious mishandling of the medical malpractice action – a "bad optics case" known as *Tigani v. Westchester Medical Group, et al*.[6] – included, but is not limited to, the following wrongful acts, omissions, errors and misconduct:

Failing to inform Dr. ELIAS about the plaintiff's attorney's offer of compromise to resolve the claims against her for $500,000.00 throughout the entirety of the case.

Failing to timely and properly advise and recommend that Dr. ELIAS, Dr. ELIAS' employer and her insurer accept the more than reasonable offer of compromise by the plaintiff's attorney to resolve the claims against her for $500,000.00.

Failing to timely and properly advise and recommend that Dr. ELIAS' employer and her insurer accept the more than reasonable demand by the plaintiff's attorney to resolve the claims against Dr. ELIAS for $2,000,000.00 after the disastrous deposition of the defense obstetrical expert, Dr. Carpenter, who admitted that "surgical errors" caused the patient's severe injuries, thereby, conceding malpractice and injury causation issues in the case while overlooking factual evidence to the contrary.

Failing to timely and properly assess, analyze, and comprehend Dr. Carpenter's opinions about the case before disclosing him as an expert and/or producing him for an expert deposition.

Failing to timely and properly prepare Dr. Carpenter for his expert deposition.

Failing to timely and properly retain, disclose and produce for deposition another defense obstetrical expert.

Ignoring Dr. ELIAS' repeated pleas to settle the case within the limits of her $2,000,000.00 insurance coverage prior to and during the trial after she learned about Dr. Carpenter's concessions of malpractice and injury causation at his expert deposition.

Misleading and deceiving Dr. ELIAS' employer and insurer about the alarming significance of Dr. Carpenter's "surgical error" testimony.

Failing to timely and adequately disclose Dr. ELIAS' expert opinions on injury causation prior to trial resulting in preclusion of her testimony on the subject.

---

[6] The case, *Tigani v. Westchester Medical Group, P.C., et al., Superior Court, Stamford/Norwalk District, Docket No.: FST Cv-16-6029906 S*, involved severe injuries to a young married woman during an emergency cesarean section delivery that, whether caused by the natural forces of labor or obstetrical malpractice, would clearly engender overwhelming sympathy for the patient and her husband and present the high risk of a plaintiff's verdict for substantial damages in excess of the defendants' insurance policies.

Failing to timely and adequately disclose Dr. Carpenter's purported "new" expert opinions[7] on standard of care and injury causation issues prior to trial resulting in preclusion of his testimony on those subjects.

Failing to timely and properly advise and recommend that Dr. ELIAS' employer and insurer accept more reasonable demands made by the plaintiff's attorney to settle the case up to and during the trial.

Committing numerous missteps at trial that were characterized, in pertinent part, by the court in a post-trial published decision as inordinate delays, omissions, failures, subterfuges and deceits.

Failing to comprehend or acknowledge that the case was indefensible and would likely lead to an adverse verdict with a substantial damage award that would outstrip the available insurance coverage.

Failing to advise Dr. ELIAS, her employer and insurer that the case was indefensible, would likely lead to an adverse verdict exceeding the available insurance coverage, and must be timely settled within the policy limits to avoid the enormous financial and personal risks to her.

Failing to advise Dr. ELIAS, her employer and insurer that a conflict of interest had arisen which required that Dr. ELIAS be assigned her own separate counsel to defend the case and act in her best interests.

Misleading and deceiving Dr. ELIAS' employer and insurer about the defensibility of the case.

Failing to advise Dr. ELIAS to retain her own private counsel to protect her interests and demand that the insurer settle the claims against her within the insurance coverage limits otherwise face the consequences of an insurance "bad faith" claim.

Failing to properly and completely assess the nature, extent, scope and scale of the patient's injury claims in the medical malpractice case.

Proceeding to trial with an indefensible case, conflicts of interest, and in complete disregard of the financial and personal risks to Dr. ELIAS for the purposes of inflating billable hours and generating exorbitantly increased revenue for the defendant law firm.

Proceeding to trial with an indefensible case, conflicts of interest and in complete disregard of the financial and personal risks to Dr. ELIAS to curry favor with Dr. ELIAS' employer and insurer.

---

[7] Dr. Carpenter's new expert opinions on injury causation contradicted his deposition testimony that "surgical errors" made by Dr. ELIAS caused the patient's severe injuries and instead focused on causes that were unrelated to malpractice.

Failing to preserve Dr. ELIAS' opportunity to present a defense on injury causation issues.

Myriad other wrongful acts, omissions and conduct that contravened legal practice standards, ethics rules, professional conduct and decorum, and reputable business practices.

42. The defendants recklessly, knowingly, willfully and intentionally violated Dr. ELIAS' rights as a client.

43. The defendants were recklessly, knowingly, willfully, and intentionally indifferent to Dr. ELIAS' concerns, worries and warnings that an adverse verdict with a substantial damage award and consequent publicity would damage her personal and professional reputation, medical career, and employment prospects.

44. The defendants were recklessly, knowingly, willfully, and intentionally indifferent to Dr. ELIAS' concerns, worries and warnings that an adverse verdict with a substantial damage award and consequent publicity would present severe financial and other personal repercussions for Dr. ELIAS and cause her injuries, damages, harm and losses.

45. The defendants negligently failed to properly defend Dr. ELIAS and protect her interests in accordance with basic principles and concepts of an attorney's representation of a defendant physician in a medical malpractice action.

46. Due to the defendants' foregoing wrongful and erroneous acts, omissions and conduct, the *Tigani v. Westchester Medical Group, et al.*, medical malpractice case inevitably resulted in a THIRTY MILLION DOLLAR+ ($30,000,000.00+) verdict for the plaintiff that was widely reported by TV news, newspapers in Connecticut and New York, online news services, and insurance, medical and legal journals among other media sources.

47. The defendants informed Dr. ELIAS about the financially disastrous $30,000,000.00+ verdict in a one-line text message. They never spoke to her about the bad outcome of the case.

48. The plaintiff's verdict, $30,000,000.00+ damage award, consequent widespread negative publicity about the case, and Dr. ELIAS' injuries, damages, harm and losses were thoroughly avoidable if the defendants had properly performed their professional duties, adhered to the ethical rules, and acted in their client's best interests.

49. Subsequently, the plaintiff's attorney entered judgment against Dr. ELIAS and her employer for approximately FIFTY MILLION DOLLARS+ ($50,000,000.00+) consisting of the $30,000,000.00+ compensatory damage verdict and $20,000,000.00+/- post-offer of compromise interest.

50. *Tigani v. Westchester Medical Group, et al.*, is now resolved. Substantial resources were needed to satisfy the claim. However, the personal, professional and financial repercussions for Dr. ELIAS continue.

51. As a result of the foregoing, Dr. ELIAS suffered serious damage to her personal and professional reputation, medical career, and employment prospects, past and future lost income, post-trial legal expenses for the retention of her own attorney to address post-judgment settlement matters, personal injuries, violations of her rights as a client, and violations of her rights as a consumer of legal services who was victimized by deceptive business practices.

52. As a result of the foregoing, Dr. ELIAS is entitled to compensatory and punitive damages in the amount of $15,000,000.00 per count, attorneys' fees, and costs.

**FACTS COMMON TO ALL COUNTS**

53. The events, actions, conduct, activities, omissions, transactions, occurrences, incidents and circumstances at issue in this matter include, but are not limited to, the following facts:

## <u>Overview of the *Tigani* Case</u>

54. Whether the injuries sustained by the patient, Elizabeth Tigani, in the underlying medical malpractice case were caused by surgical errors or unfortunate labor and delivery complications is irrelevant in this matter. What is relevant is that Ms. Tigani sustained dreadful injuries during the cesarean delivery of her baby and the medical malpractice lawsuit that she filed in its wake presented “bad optics”, i.e., a pleasant young married woman suffered horrific injuries during an emergency cesarean section that would understandably engender overwhelming sympathy for her and present the high risk of a plaintiff’s verdict for substantial compensatory damages in excess of the defendants’ insurance policies.

55. Ms. Tigani had a normal, uneventful pregnancy prior to the emergency cesarean section performed by Dr. ELIAS. She was admitted to Greenwich Hospital after her water broke on December 6, 2014.

56. Later that evening, Ms. Tigani was in active labor pushing for over four hours when Dr. ELIAS determined that there was an “arrested descent” of the fetus and the patient’s labor had stalled. Sometime around midnight, December 7, Dr. ELIAS recommended to Ms. Tigani that a cesarean section be performed; however, the patient decided to continue pushing in the hope that she would vaginally deliver her baby. In the early morning hours of December 7, at approximately 2:30 a.m., the patient finally agreed to operative delivery and Dr. ELIAS subsequently performed a cesarean section to deliver the baby.

57. During the cesarean section, Ms. Tigani's uterus was discovered to have avulsed or torn away from the vagina and she sustained a large bladder laceration. The extensive nature of the injuries required six hours of surgery to repair the uterus and bladder immediately after the baby was delivered. Ms. Tigani’s injuries created the risk of uterine rupture if she became

pregnant again thereby permanently impairing her ability to bear children. She was told by the urological surgeon who operated on her that she could never have children again.

58. Ms. Tigani's injuries severely impaired her ability to care for the newborn baby. She was not able to see or hold her newborn or have any skin-to-skin contact. She was unable to enjoy caring for her newborn baby, largely confined to bed, and unable to breast feed.

59. Subsequent to her discharge from the hospital, Ms. Tigani contracted a series of infections, mostly UTIs, and experienced constant leakage of urine despite having a catheter in place. Ms. Tigani's injuries were found to have developed into two vesicovaginal fistulas, one large and one small, which required surgical repair. The fistula repair surgery involved grafting labial tissue leaving Ms. Tigani with permanent numbness and disfigurement. Ms. Tigani also suffered permanent damage to her pelvic floor muscles resulting in persistent daily pain and discomfort, weekly physical therapy sessions, and painful sexual intercourse. During the ensuing years, she frequently experienced UTIs secondary to the injuries she sustained in the cesarean section.

60. Ms. Tigani was thirty-two years old at the time of the cesarean section injury and three years into her marriage. She testified that her injuries seriously impacted virtually all aspects of her daily experience and quality of life. She experienced the subsequent pregnancies of her younger children through a surrogate.

61. At the time of trial in late 2024, Ms. Tigani had endured the above-described medical problems for nearly ten years and had a life expectancy of thirty-nine years.

62. During the course of discovery in the *Tigani* case, the defense obstetrical expert, Dr. Carpenter, testified at his deposition, in pertinent part, that Dr. ELIAS committed "surgical errors" in performing the cesarean section which caused the patient's frightful injuries. Dr. Carpenter's

deposition testimony was tantamount to concessions of malpractice by Dr. ELIAS and injury causation. Dr. Carpenter's testimony constituted a de facto concession of liability and causation and, thereby, rendered the case indefensible[8].

63. All of the foregoing facts were well known to the defendants, RYAN RYAN DELUCA, LLP, COSTA and CESARIO, during discovery in the *Tigani* case.

64. All competent attorneys experienced in medical malpractice cases would agree that the *Tigani* case presented "bad optics", i.e., it would provoke unavoidable sympathy from a jury and create the very high risk of a plaintiff's verdict with a substantial damage award well in excess of the available insurance coverage ($2,000,000.00 for Dr. ELIAS and $2,000,000.00 for Westchester Medical Group, P.C.).

65. All competent attorneys experienced in medical malpractice cases would agree that Dr. Carpenter's expert deposition testimony in the *Tigani* case was a concession that malpractice caused the patient's injuries. In essence, all competent attorneys would view Carpenter's testimony as a de facto concession of liability and causation.

66. All competent attorneys experienced in medical malpractice cases would agree that a case presenting the foregoing undisputed facts, elements, risks and exposure required the defense counsel to make every effort to settle the case within the insurance coverage when the opportunity presented itself to protect their clients from a verdict exceeding the coverage limits, personal financial risk, and consequent negative media publicity.

67. The defendants either intentionally overlooked those facts to serve their own interests or they were recklessly, knowingly, willfully and intentionally indifferent to those facts or those facts negligently escaped their comprehension.

---

[8] Dr. Carpenter's concessions made the case indefensible even though Dr. ELIAS believed that Ms. Tigani's injuries were unavoidably caused by the shearing forces of labor after the baby's head became deeply wedged in the pelvis

68. The jury awarded Ms. Tigani $1.37 million for economic damages and $29 million for non-economic damages consisting of $5 million for her past and future physical injuries, $5 million for past and future physical pain and suffering, and $19 million for forty-nine years of interference with and loss of the enjoyment of life's activities. (*Exhibit 1, Decision Denying Defendants' Motion to Set Aside Verdict and Motion for Remittitur, dated January 29, 2025, by Judge Ozalis*.)

69. The financial repercussions of the plaintiff's verdict in the *Tigani* case were enormous to Dr. ELIAS. The $30.37 million damage award was $28.37 million more than Dr. ELIAS' insurance coverage. Dr. ELIAS was potentially responsible to pay $26.37 million to satisfy the judgment that would be entered.

70. The *Tigani* verdict had other personal repercussions for Dr. ELIAS that were enormous. She sustained significant harm to her personal and professional reputation, medical career, and employment prospects. Her relationship with her employer deteriorated. She suffered illness which required medical leave. She lost income. She was compelled to retain personal counsel to represent her interests and paid significant legal fees.

**The *Tigani* Case is Filed in 2016**

71. *Tigani v. Westchester Medical Group, Sara B. Elias, M.D., and Greenwich Hospital*, was filed in Superior Court, Judicial District of Stamford/Norwalk on September 28, 2016.

72. Ms. Tigani was represented by David Golub of Silver, Golub & Teitell.

73. The defendants represented Westchester Medical Group[9] and Dr. ELIAS. Wiggins & Dana represented Greenwich Hospital.

---

[9] Westchester Medical Group is at times variously referred to as "WMG" throughout this Complaint. Dr. ELIAS was a WMG employee.

**The Deposition of Dr. ELIAS in 2017**

74. Plaintiff's attorney, Mr. Golub, took Dr. ELIAS' deposition on May 2, 2017.

75. Dr. ELIAS' deposition testimony, in pertinent part, addressed the timing of her recommendation to the patient that a cesarean section delivery be performed and the discussion about the risks, benefits and alternatives to this operation.

76. Dr. ELIAS essentially testified that, when she initially recommended a cesarean section delivery to Ms. Tigani around midnight on December 7, which was four hours into the second stage of labor, she did not warn her about the risks of maternal injury since the patient wanted to continue pushing at the time and the monitor tracings indicated that the baby was well.

77. According to Dr. ELIAS, when the patient relented to her recommendation for a cesarean section delivery at approximately 2:30 a.m., that is when the patient was advised about the risks, benefits and alternatives to the procedure.

78. Dr. ELIAS gave the opinion that the maternal injury risks presented by the patient's decision to continue pushing around midnight did not increase under the circumstances.

79. Dr. ELIAS' deposition testimony, in pertinent part, addressed the conditions she encountered before and during the operation and the cause of the patient's severe injuries during the emergency cesarean.

80. Dr. ELIAS testified that Ms. Tigani's labor had arrested because the baby's head was deeply wedged in the patient's pelvis. A decision was made to perform a cesarean section delivery; the patient was taken to the O.R. to undergo this operation.

81. Dr. ELIAS also testified that, upon entry into the uterus during the operation, she confirmed that the baby's head was deeply wedged against the pelvic bone which caused a suction to

develop between the head and pelvis. The situation required gentle traction to release the baby's head from this suction without causing injury and elevate it out of the pelvis.

82. Dr. ELIAS further testified that the gentle traction was applied from above and below. This meant that she used her hand inside the uterus to break the suction by pushing upward on the baby's head to elevate it out of the abdomen while a nurse used two or three fingers in the vagina to help push the head up off the pelvic bone.

83. According to Dr. ELIAS' testimony, she used her "right hand" to remove the baby's head from the pelvis because "[y]ou can only use one hand, there is no room to use the second hand".

84. Dr. ELIAS additionally testified that she didn't immediately notice her patient's injuries since her focus was on the safe delivery of the baby and placenta, cord blood sampling, and hemostasis of the uterine and abdominal incisions.

85. Finally, Dr. ELIAS gave an opinion in her deposition that "shearing forces" during labor caused the grievous injuries sustained by Ms. Tigani.

86. As discovery progressed in the case, it was apparent that Mr. Golub had developed sufficient evidence to proceed to trial, demonstrate a prima facie case, and submit the case to a jury for a verdict. More importantly, the evidence established the nature, extent, permanency and severity of the patient's injuries. In summary, the *Tigani* case indisputably presented the prospect of a trial ending in an adverse verdict with a substantial damage award against Dr. ELIAS and the other defendants, and it exposed these defendants to financial risks that grossly exceeded their insurance coverage limits.

**<u>Plaintiff's Offers of Compromise in 2018</u>**

87. Mr. Golub filed Offers of Compromise directed at each defendant in the *Tigani* case on March 23, 2018. (*Exhibit 2, Offer of Compromise to Defendant Sara B. Elias, M.D., dated March 23,*

*2018; Exhibit 3, Offer of Compromise to Defendant Westchester Medical Group, P.C., dated March 23, 2018; Exhibit 4, Offer of Compromise to Defendant Greenwich Hospital, dated March 23, 2018.*)

88. Plaintiff's Offer of Compromise to defendant Dr. ELIAS requested $500,000.00 to settle the claims against her. (*Exhibit 2.*)

89. Plaintiff's Offer of Compromise to defendants Greenwich Hospital and Westchester Medical Group respectively requested $350,000.00 and $1,200,000.00 to settle the claims against these parties. (*Exhibits 3 & 4.*)

90. The defendants never advised Dr. ELIAS about the plaintiff's $500,000.00 offer of compromise throughout the entire case; they never even mentioned that she had the opportunity to settle the claims against her for a sum well within her insurance coverage. The failure to inform Dr. ELIAS about the plaintiff's offer to settle the case for $500,000.00 was an ethical violation.

91. Dr. ELIAS did not become aware of the $500,000.00 offer to compromise until after the $30,000,000.00+ verdict was returned against her.

92. Had Dr. ELIAS known about the plaintiff's attorney's offer to settle the claims against her for $500,000.00 in 2018, she would have jumped at the opportunity and demanded that the case be settled for that amount.

93. The plaintiff's offers to settle the claims against each defendant for the foregoing amounts, in view of the financial exposure risks presented by the *Tigani* case, was self-evidently more than reasonable at the time.

94. The attorneys for defendant Greenwich Hospital seized the chance to exit the *Tigani* case and wisely accepted the plaintiff's offer of compromise directed to their client.

95. The defendants improperly and unwisely rejected or ignored the plaintiff's offers of compromise directed at Dr. ELIAS and her employer. This imprudent decision cost their clients more than $26,000,000.00.

**The Deposition of Dr. Carpenter and the Concessions of Malpractice and Injury Causation on March 18, 2024**

96. On October 23, 2023, the court issued a new scheduling order in the *Tigani* case requiring the defendants to disclose their experts by January 5, 2024, and to produce experts for their deposition by March 5, 2024.

97. The defendants filed expert disclosures on February 12, 2024. They disclosed Marshall W. Carpenter, M.D., as the obstetrical expert for Dr. ELIAS and her employer. The expert disclosure for Dr. Carpenter stated that he would testify that Dr. ELIAS,

> "did not depart from the standard of care with respect to [her] care and treatment of the plaintiff …. [and] [i]n doing so, he will refute every allegation of negligence in the plaintiff's complaint and every opinion of the plaintiff's experts pertaining to the standard of care",
>
> and
>
> "that the defendants complied with the standard of care as it pertains to the performance of a Cesarean section in this case".

(*Exhibit 5, Defendants' Expert Disclosure for Dr. Carpenter, dated February 12, 2024*.)

98. Dr. Carpenter subsequently testified to exactly the opposite of what the expert disclosure stated would be his opinion testimony in the *Tigani* case.

99. Mr. Golub took Dr. Carpenter's expert deposition in the *Tigani* case on March 18, 2024. Dr. Carpenter's expert opinion testimony amounted to a concession that Dr. ELIAS had committed malpractice before and during the cesarean section and her negligence was responsible for the patient's extensive injuries. Dr. Carpenter's deposition testimony was a de facto concession of liability and causation.

100. In pertinent part, Dr. Carpenter testified as follows about Dr. ELIAS' initial recommendation to the patient about the cesarean section:

> Q. I want you to assume that between 16:55 and 20:30, there was no discussion of a cesarean section with Ms. Tigani.
> A. You want -- you want me to assume that; is that correct?
> Q. Yes. If you assume that, isn't it true that that's a violation of the standard of care by Dr. Elias who was required to discuss the risks and benefits of a -- of -- of intervening within three hours or an approximate three hour time frame of the start of the second stage of labor?
> A. *I agree.*
> ……
> Q. And in 2014, Dr. Elias had an obligation under the standard of care to advise Ms. Tigani of the risks and benefits of a cesarean section, correct?
> A. *Yes.*
> Q. I want you to assume that when Dr. Elias raised the issue of a cesarean section with Ms. Tigani, she did not advise Ms. Tigani of the risks of continuing in a prolonged second stage of labor or of the decreasing likelihood of vaginal delivery, which you have said the standard of care required an obstetrician to discuss with the patient in December 2014. If you assume that testimony is accurate, isn't it true that Dr. Elias violated the standard of care in her treatment of Elizabeth Tigani on December 14th in December 2014?
> A. *If she did not apprise the patient of the risk of either option, then -- then she gave incomplete counsel. I agree.*
> Q. And if she gave incomplete counsel, that was violated of the -- that violated the standard of care as of December 2014, correct?
> A. *Assuming that in her -- in the nurse's note at that time all the discussion was represented, then I would agree.*
>
> [Emphasis added.]

101. In pertinent part, Dr. Carpenter testified as follows about Dr. ELIAS' performance of the cesarean section delivery:

> A …. We also note that there's a[n] avulsion of the posterior wall of the bladder. *There are two separate injuries both due to blunt force exerted, in my interpretation, by the operator's hand* rather than pushing -- rather than grasping the fetal head through the uterine wound. *At least on some occasions, force was applied to the lower uterine wall and to the bladder causing injury to both those parts of the mother's anatomy.*
> BY GOLUB: Q. All right. So what you're testifying, Doctor, is that the baby' s head was not delivered through the uterine incision; it was delivered through an avulsion created between the wall of the vagina and uterus; isn't that right?
> A. No. The baby's head was for -- in great probability, delivered through the larger, uterine incision made as part of the cesarean section. The other injuries resulting in a window

through the lower part of the uterus and a window into the bladder were not the site of delivery of the baby's head.

Q. Why did the -- if -- if that wasn't the site of the baby's delivery of the head, why did the operator's hand tear into the wall between the vagina and the uterus?

A. *Because the operator did not understand where her hand was. She thought her hand was inside the uterus approximate to the baby's head. Her hand was actually in the space below the uterine incision such that she perforated the lower wall of the uterus.*

Q. Okay. So that the operator's hand mistakenly perforated the wall between the uterus and the vagina and then struck the back of the bladder, injuring the back of the bladder, too, correct?

A. *Correct.*

Q. So the operator didn't understand where her hand was when she was deliver — attempting to deliver the fetus' head, correct --

A. She thought --

Q -- that ' s your -- that's your explanation?

A. *I'm extremely confident that she thought her hand was inside the uterus. I'm also quite confident that it was outside the uterus.*

….

Q. ….. Isn't it true that the proper standard of care for Dr. Elias in December 2014 required her to understand where her hand was located when she was performing the -- the Cesarean section?

….

THE DEPONENT: I don't view this as a standard of care issue, that is any surgical procedure bears with it a risk to varying degrees of unanticipated complications including injuries due to the surgical intervention. This is no different. Clearly, the physician is intending to put her hand inside the uterus. If she intended to deliver the baby through an -- an avulsion injury in the lower part that she intentionally created, then that would be a abject dereliction of duty but she did not.

Q. So it's your testimony that it's consistent with the standard of care for the surgeon to mistakenly puncture the wall between the vagin -- the vagina and the uterus thinking that she -- her hand was in fact in the uterine incision?

MR. GOLUB: That's your testimony?

THE DEPONENT: No, --

THE DEPONENT: -- my testimony -- I -- I think I was quite clear. I don't think this has anything to do with standard of care. *I think this is an injury that occurred during a surgical intervention in a difficult case. I don't think that one is 'within the standard of care' to create unanticipated injury.* Nor do I think that the patient is outside the standard of care having done so. I think the use of the term standard of care is inappropriate in this circumstance.

…….

THE DEPONENT: I've already answered the question. This has nothing to do with standard of care. It's an -- an injury that occurred – obvious -- inadvertently during a surgical procedure. Obviously, the surgeon is required to know where the bladder is, what the uterine incision is capable of in terms of delivering a baby, how to elevate the baby's head. She's required to know how to do that. *This is an error*, but it has nothing to do with standard of care.

BY MR. GOLUB:
Q. So it's an *error* to puncture – it's an *error* – you agree that it's an *error*. When you say *error*, it's a *surgical error*, correct?
A. *Correct.*
…..
Q. Okay. It' s a *surgical error* for Dr. Elias have punctured the wall between the uterus and the vagina but *you're saying that surgical error is not a violation of the standard of care* for -- for -- for -- for physicians performing cesarean section in December '14?
A. It would be --
Q. That's your testimony?
A. *It would be a violation of standard of care if it was intentional.* ….

(Exhibit 6, Deposition of Dr. Carpenter [Pgs. 138-143] [emphasis added.])

102. Dr. Carpenter's nonsensical assertions that the "surgical error" was not coextensive with a "violation of the standard of care" because it was not "intentional" is a bizarre statement that flies in the face of logic and rationality since all acts of medical malpractice and negligence are, by definition, unintentional errors or mistakes (i.e., carelessness)[10].

103. The defendants did not properly prepare Dr. Carpenter for his expert deposition.

104. The defendants did not review with Dr. Carpenter his planned expert opinion testimony prior to the deposition.

105. The defendants did not discuss with Dr. Carpenter whether he could support Dr. ELIAS' testimony that she placed her right hand inside the uterus to disengage the fetal head or her opinion that Ms. Tigani's injuries were caused by "shearing forces" during labor.

106. The defendants did not discuss with Dr. Carpenter how his expert opinions differed from those of the plaintiff's obstetrical expert prior to the deposition.

107. The defendants did not ensure that Dr. Carpenter's expert opinions were based on the factual evidence amassed prior to his deposition including, in pertinent part, Dr. ELIAS' testimony about how she placed her right hand inside the uterus, disengaged the baby's head

[10] Unless, of course, a defendants' harmful acts in the course of medical treatment were intentional, then such actions would be inconceivably cruel, an intentional tort, and constitute criminal assault.

from the maternal pelvis, and elevated it out of the abdomen, or Dr. ELIAS' injury causation testimony about the "shearing forces" of labor.

108. Dr. Carpenter's expert opinion testimony made the case against Dr. ELIAS indefensible.

109. No other conclusion can reasonably be drawn yet the defendants, particularly Attorney COSTA, remarkably drew a different, illogical assessment of the situation. COSTA asserted that Dr. Carpenter's testimony meant that Dr. ELIAS' "surgical error" was not malpractice because it was "something that was not intended/supposed to happen". Somehow, it escaped Attorney COSTA's comprehension that malpractice is always unintended and not "supposed to happen".

110. The defendants did not inform Dr. ELIAS for several weeks that her own obstetrical expert, Dr. Carpenter, had conceded at his deposition that she committed "surgical errors" which caused her patient's serious injuries.

**<u>Mr. Golub's Settlement Demand Letter on April 15, 2024</u>**

111. Instead, Dr. ELIAS learned about Carpenter's de facto concession of liability and causation when the defendants emailed her a "demand letter" sent by Mr. Golub, dated April 15, 2024. The defendants sent the letter to Dr. ELIAS as an email attachment on April 18, 2024.

112. The letter by Mr. Golub, in pertinent part, stated the following:

> We have now completed depositions of the parties' experts in the above matter. Defendants have, to date, refused to make any settlement offer, insisting they did not violate the standard of care and disputing the extent of Ms. Tigani's injuries and the Tiganis' decision to engage surrogates to have further children. Whatever the basis for Defendants' prior contentions, *the depositions of Defendants' liability and damages experts directly belie Defendants' positions*. …. *Defendants' liability expert, Dr. Carpenter, has literally admitted Dr. Elias's violations of the standard of care and further attributed Plaintiff's injuries to Dr. Elias's "surgical error" in "mistakenly" puncturing a hole in Ms. Tigani's utero-vaginal wall.*
> ….
> As you know, this case is scheduled for a settlement conference with the Court on April 30, 2024 and, failing settlement, for jury selection and trial beginning May

> 21, 2024. *Defendants have disclosed insurance limits of $4 million applicable to Ms. Tigani's claims. In light of the admissions by Defendants' experts recounted below, this insurance is far less than the likely verdict for Ms. Tigani. I am writing to convey Plaintiffs offer to settle this action now for the full amount of Defendants' available insurance*, and to advise you that if Defendants do not accept Plaintiffs offer by April 30, 2024, Plaintiff will not in the future offer to settle within Defendants' insurance limits.
>
> ….
>
> This action has been pending for nearly 8 years, and Ms. Tigani has an interest in resolving this matter now, before incurring the expense and burden of preparing for and undergoing trial. Defendants have refused to date to may any offer of settlement – a position that Ms. Tigani believes is untenable in light of Dr. Carpenter's admissions and the unrefuted evidence of Ms. Tigani's substantial damages.
>
> *In an effort to settle this action before trial and without further expense, and in light of Defendants' limited insurance, Ms. Tigani offers to settle this matter now for $4 million*. This offer will remain open until close of business on April 30, 2024, the date of the scheduled settlement conference in this matter. If the offer is not accepted by 5 p.m. on April 30, 2024, Ms. Tigani will not further agree to settle this matter within the limits of Defendants' available coverage, but will proceed to trial and, *upon recovering a verdict in excess of the insurance limits, will seek to collect the verdict from Defendants' assets*.

(*Exhibit 7, Letter by David Golub, Esq., dated April 15, 2024 [emphasis added]*.)

113. Mr. Golub’s letter to the defendants offering to settle the claims against Dr. ELIAS and WMG for the $4,000,000.00 insurance coverage, in view of the indisputable evidence and financial exposure risks, was self-evidently more than reasonable at the time.

114. Golub’s letter was a clear warning to the defendants’ attorneys that the case against Dr. ELIAS and WMG was indefensible and once again raised the very real prospect of an adverse verdict with a substantial damage award exceeding the insurance coverage limits. The letter emphasized the financial exposure risks to Dr. ELIAS’ personal assets; i.e., the plaintiff would seek to collect the monetary damages that exceeded the insurance coverage against those assets.

**Dr. ELIAS' Reaction to the Demand Letter: Repeated Pleas to Settle the Case Within the Insurance Coverage Fall on Deaf Ears**

115. When Dr. ELIAS read Mr. Golub's letter, she instantly understood the implications of Dr. Carpenter's deposition testimony. She immediately understood that the case against her had become indefensible and presented the likelihood of a substantial damage award that placed her personal assets at risk. She became deeply distressed, worried, anxious and alarmed about the situation.

116. Over the next several months, Dr. ELIAS repeatedly pleaded with the defendants and insurer that the claims against her be settled for an amount within her insurance coverage limits. The defendants repeatedly ignored Dr. ELIAS' pleas.

**The Defendants Misrepresent and Mischaracterize the *Tigani* Case as Defensible and Downplay the Risks of a Substantial Damage Award**

117. Instead, the defendants improperly concluded and/or conveyed that the case was defensible and misled WMG and the insurer to believe that the case could be defended despite Dr. Carpenter's disastrous testimony.

118. The defendants also misconstrued the nature, extent, scope and severity of Ms. Tigani's injuries and damages.

119. After the defendants provided a report to the insurer about Dr. Carpenter's expert deposition, a claims representative, Olga Kats-Chalfont, emailed Attorney COSTA asking "What does it mean 'this is an error but it has nothing to do with the standard of care'?" In response, Attorney COSTA misrepresented and mischaracterized the scope, significance and implications of Dr. Carpenter's testimony and misstated the reasons why Mr. Golub concluded that the case was indefensible. (*Exhibit 8, Emails Kats-Chalfont – Costa, dated May 17, 2024.*) In essence, COSTA misled the insurer about the defensibility of the *Tigani* case.

120. Attorney COSTA also indicated the defensibility of the case and his intent to take a verdict at trial despite the Carpenter testimony in an email to Dr. ELIAS: "Also, the carrier intends to recommend the immediate retention of appellate counsel …. with an eye towards handing [*sic*] the post-verdict appeal *in the event of an adverse verdict*." (*Exhibit 9, Email Costa – Elias, dated April 18, 2024 [emphasis added]*.)

121. Moreover, the defendants improperly concluded and/or conveyed that the primary injury claimed by Ms. Tigani was her reliance on "surrogate pregnancy" to have her younger children. Attorney COSTA stated,

> "The *main issue* there is that we have been unable to identify a single case in the United States in which *surrogate pregnancy* was the damage claimed. In other words, this case has a ground-breaking issue."

(*Exhibit 8, Emails Kats-Chalfont – Costa, dated May 17, 2024 [emphasis added]*.) In essence, COSTA downplayed and discounted Ms. Tigani's severe injuries.

**The Defendants' Misfeasance, Malfeasance,**
**Malpractice and Misconduct Prior to Trial**

122. Over the next several months, the *Tigani* case moved towards trial with the potential outcome getting progressively bleaker. Acting on the defendants' improper, inaccurate and/or misleading assessments about the case, the insurer never offered the insurance coverage limits to settle the claims against Dr. ELIAS and/or WMG. The defendants' misrepresentations to the insurer directly led to the disastrous outcome for Dr. ELIAS. The defendants never advised, insisted or recommended that the insurer offer the entire $4,000,000.00 insurance coverage even though Mr. Golub indicated that he would accept that amount to settle the case prior to starting trial. Summit Health, WMG's corporate parent and the entity funding the risk retention group providing insurance to Dr. ELIAS and her employer, detrimentally relied on the defendants' misleading, deceptive, fallacious and/or inaccurate assessments to refrain from

offering the entire $4,000,000.00 insurance coverage to settle the claims against Dr. ELIAS and her employer.

123. The defendants failed to advise all interested parties that a conflict of interest had arisen between Dr. ELIAS and her employer (WMG), corporate parent Summit Health, and the insurer.

124. This conflict of interest required that Dr. ELIAS be assigned her own separate counsel to defend the case and act in her best interests.

125. The failure to inform Dr. ELIAS about the conflict of interest was an ethical violation.

126. The defendants failed to advise Dr. ELIAS about the right to retain her own private counsel to protect her interests and demand that the insurer settle the claims against her within the insurance coverage limits or else face claims of insurance "bad faith" for any damage award exceeding the insurance coverage limits.

127. The failure to inform Dr. ELIAS about the right to retain her own private counsel was an ethical violation.

128. The defendants improperly served their own financial interests and discounted, downgraded, neglected and ignored Dr. ELIAS' best interests and the significant financial and personal risks presented to her by an adverse verdict with a substantial damage award exceeding the insurance coverage limits.

129. The defendants were negligently, carelessly, recklessly, knowingly, willfully and intentionally indifferent to the distress, anxiety, harm and injury that they were causing Dr. ELIAS.

130. The defendants improperly, incompletely and deceptively assessed the nature, extent, scope and scale of the patient's injury claims in the medical malpractice case so as to obscure

and obfuscate the potential financial exposure to Dr. ELIAS and undervalue the potential damage award in the case.

131. The defendants improperly proceeded to trial with an indefensible case, conflicts of interest, and in complete disregard of the foregoing risks for the purpose of inflating billable hours and generating exorbitantly increased revenue for the defendant law firm.

132. The defendants improperly proceeded to trial with an indefensible case, conflicts of interest and in complete disregard of the foregoing risks to curry favor with Dr. ELIAS' employer and insurer.

133. The defendants failed to timely file and serve expert disclosures stating that Dr. ELIAS would offer opinions at trial on standard of care issues.

134. The defendants failed to timely file and serve expert disclosures stating that Dr. ELIAS would offer opinions at trial on injury causation issues.

135. The defendants failed to timely file and serve expert disclosures stating that Dr. Carpenter would offer new opinions at trial on standard of care issues that contradicted and differed from his deposition testimony.

136. The defendants failed to timely file and serve expert disclosures stating that Dr. Carpenter would offer new opinions at trial on injury causation issues that contradicted and differed from his deposition testimony.

137. The defendants' foregoing omissions occurred despite multiple meetings and discussions with both Dr. ELIAS and Dr. Carpenter about these matters during the months prior to the commencement of the trial.

138. The defendants timely and properly retain, disclose and produce for deposition another defense obstetrical expert.

139. The defendants' foregoing failures and omissions denied Dr. ELIAS the opportunity to mount a defense at trial on injury causation issues.

140. On August 21, 2024, the plaintiff's filed a pretrial motion to preclude expert testimony from "nondisclosed experts", including Dr. ELIAS.

**The Defendants' Misfeasance, Malfeasance, Malpractice and Misconduct at Trial**

141. Jury selection commenced in the *Tigani* case on September 4, 2024.

**Preclusion of Dr. ELIAS' Standard of Care Opinion Testimony Due to the Defendants' Ineptitude**

142. On September 9, 2024, the court, Judge Ozalis presiding, held oral argument on motions.

143. For the first time in this eight-year-old case, the defendants argued that Dr. ELIAS should be permitted to give standard of care expert testimony. In essence, the defendants had improperly delayed disclosing for months and years that they intended to call Dr. ELIAS to give expert opinions on standard of care issues.

144. The court ruled that Dr. ELIAS could not give standard of care expert testimony as the defendants had already disclosed and intended to call at trial a standard of care expert; i.e., Dr. Carpenter. The court did permit Dr. ELIAS to give limited expert opinion testimony as to what her understanding of the standard of care was in December 2014; Mr. Golub was allowed to take a second deposition of Dr. ELIAS on this issue.

145. The defendants filed an expert disclosure for Dr. ELIAS which included a causation opinion that directly contradicted Dr. Carpenter's causation opinion. A causation expert opinion by Dr. ELIAS was not permitted by the court in its prior ruling.

**Dr. ELIAS' Second Deposition & Its Consequences**

146. Dr. ELIAS' second deposition was held on September 17, 2024. During the deposition, Mr. Golub learned that the defendants intended to have Dr. ELIAS give expert opinions on injury causation at trial.

147. Subsequently, the plaintiff's attorneys filed a pretrial motion to preclude Dr. ELIAS' newly disclosed expert causation opinion on the grounds that (1) the defendants' attempt to present such testimony at trial was not authorized by the court's order and (2) those causation opinions were not scientifically supported and, therefore, invalid.

148. Meanwhile, the defendants summarized Dr. ELIAS' second deposition to her employer, WMG, and the insurer. The defendants' report did not acknowledge that this second deposition had further harmed the defense of the case and enhanced the plaintiff's case. In fact, the defendants' report on Dr. ELIAS' second deposition demonstrates that Attorney COSTA clearly did not understand the significance of his own description of Dr. ELIAS' testimony. COSTA either didn't recognize or deliberately overlooked that Mr. Golub had completely neutralized Dr. ELIAS' testimony on standard of care and injury causation issues. In pertinent part, Attorney COSTA stated,

> "She was asked about whether it would be a deviation if her hand was mistakenly outside of the uterine wall. She first denied that her hand was outside the uterine wall. *She then agreed that if her hand was in fact outside the uterine wall, it would be a violation of the standard of care. She then repeatedly maintained that she disagreed with Dr. Carpenter's opinion and that her hand was never outside the uterine wall. Dr. Elias was next shown Dr. Carpenter's opinion about how he was 'quite confident that it was outside the uterus'.*
> .....
> She is further expected to testify that persistent pressure from the fetal head against the mother's pubis during a difficult or prolonged labor led to trauma to the bladder wall; and that during the attempts, the lower uterine segment, which was also very thinned out, included friable, weakened tissue which was more susceptible to tearing even with gentle traction, and releasing the suction exacerbated the sheering of that tissue. *She was crossed with Dr. Carpenter's testimony that the injuries were caused by Dr. Elias's hands being external to the uterine wall. She denied that this happened although she acknowledged that*

*Dr. Carpenter's theory of the mechanism could explain the injuries*. She emphasized that she was there and Dr. Carpenter was not."

149. The defendants failed to recommend and insist that the insurer settle the case within the insurance coverage limits in the aftermath of such damaging deposition testimony.

150. Opening statements were given and evidence began in the trial on September 24, 2024. Mr. Golub was lead counsel for the plaintiff. Attorney COSTA was lead counsel for Dr. ELIAS and WMG. Dr. ELIAS was present throughout the trial.

**Preclusion of Dr. ELIAS' Injury Causation Opinion Testimony Due to the Defendants' Ineptitude**

151. The next day, September 25, 2024, the court granted the plaintiff's motion to preclude Dr. ELIAS' injury causation opinions holding that the defendants' expert disclosure violated the previous order that only permitted Dr. ELIAS to offer expert testimony on her understanding of the standard of care in 2014. The court noted that the defendants did not present any reason why they had delayed until the eve of trial in disclosing Dr. ELIAS as an expert on injury causation.

152. The defendants' conduct at trial can be best described as constituting misfeasance, malfeasance, mendaciousness and incompetence. Such behavior only augmented the harm done to Dr. ELIAS.

153. The court found that,

> "(l) defendants *purposefully and unreasonably delayed* disclosing Dr. Elias' expert causation opinion until the eve of trial; (2) plaintiff was severely prejudiced by the late disclosure and had no way to prepare to counter Dr. Elias' shearing theory of causation; (3) at the time of trial, this case was eight years old and had been continued many times; (4) Dr. Elias was still able to testify as to what she did and what occurred during the cesarean section; (5) defendants had another causation expert disclosed and ready to testify at trial; and (6) no sanction other than preclusion of Dr. Elias' late disclosed expert causation opinion would have adequately addressed defendants' late disclosure."

(*Exhibit 1, Decision Denying Defendants' Motion to Set Aside Verdict and Motion for Remittitur, dated January 29, 2025, by Judge Ozalis [emphasis added]*.)

**Preclusion of Dr. Carpenter's Purportedly New Injury Causation Opinions Due to the Defendants' Incompetence, Dishonesty and Attempted Subterfuge**

154. The defendants then abruptly disclosed that Dr. Carpenter would offer new expert opinions on causation that contradicted his earlier deposition testimony on the subject on October 8, 2024. Dr. Carpenter was going to now assert that the "injury was caused by [Dr. ELIAS'] hand being inside the uterus and the blunt force that she exerted inside the uterus."

155. The defendants disclosed Dr. Carpenter's opinions after plaintiff's standard of care and causation expert had testified in the trial and left the state clearly causing undue prejudice.

156. Regardless, the court directed the defendants to send Carpenter's planned new opinions in writing to plaintiff's counsel by 8 p.m. that evening since no one knew what his new opinions would be. The defendants' written disclosure of the new Carpenter opinions was deemed by the court to be "wholly inadequate".

157. The court also made the following findings about the defendants' conduct at trial:

> "At the request of plaintiffs [sic] counsel on the day Dr. Carpenter was to testify at trial, this Court specifically asked defendants' counsel whether Dr. Carpenter would be offering any new expert opinions other than those previously disclosed in his expert disclosure and at his deposition. The response given to the Court was "[n]ot that I am aware of, Your Honor." This answer would prove to be *false*.
> Shortly after Dr. Carpenter took the stand at trial, it quickly became clear that he was going to offer not only a new expert causation opinion that deviated significantly from his prior damaging causation opinions, which had been played to the jury by plaintiff, but also new expert opinions on urological injuries plaintiff suffered. Specifically, Dr. Carpenter was now going to opine that instead of the injury to plaintiff being caused by Dr. Elias' hand being outside the uterus, he was now going to opine, for the first time in this eight year old case, that the injury was caused by her hand being inside the uterus and the blunt force that she exerted inside the uterus. (10/8/24 Trial Tr. 19-20.)
> At trial, it became evident that the timing of when Dr. Carpenter discovered that he had these new opinions, which deviated significantly from his prior disclosed expert

> opinions, was *suspect*. Defendants presented to the Court that Dr. Carpenter first came up with these opinions on causation after Dr. Elias testified at trial. In particular, Dr. Carpenter said he only found out facts giving rise to these new opinions after reviewing trial transcripts personally delivered to his Rhode Island house by defendants' counsel. Those alleged unknown new facts were: (1) that Dr. Elias claimed her hand was always inside the uterine incision; and (2) he had no prior information on the meaning of Dr. Elias' reference in her operative report to "multiple attempts" to deliver the baby. However after questioning by the court outside the presence of the jury, *it was clear that Dr. Carpenter knew those facts long before Dr. Elias testified at trial, had reviewed Dr. Elias' deposition transcript that referred to both issues in detail, and had a lengthy phone conversation with Dr. Elias and counsel approximately one month prior to trial regarding these issues*.
>
> Dr. Carpenter also admitted that he had *multiple meetings with defendants' counsel prior to his trial testimony where they discussed his change of opinion, one of which occurred one month prior to trial. Dr. Carpenter also admitted that he had met with defendants' counsel and discussed a 'competing hypothesis' opinion*. It is undisputed that *defendants' counsel never contacted plaintiff's counsel regarding Dr. Carpenter's new 'competing hypothesis' theory, never disclosed it, and, in fact, denied to this court that Dr. Carpenter had new opinions on the day Dr. Carpenter was to take the stand. No updated expert disclosure was filed by defendants*. By the end of Dr. Carpenter's first day of testimony at trial, neither the Court nor plaintiff had a clear idea of the exact substance of this new opinion. In an effort to find out the exact details of this new 'competing hypothesis' opinion, this Court ordered defendants' counsel to send plaintiff's counsel by 8 p.m. on October 8, 2024, 'in writing, the opinions that Carpenter was going to offer, the new opinion because nobody knows what it is,' (10/8/24 Trial Tr. 35.) The e-mail sent by defendants' counsel that evening in accordance with the Court's order completely failed to set forth specifically what the new opinion was and, the following day, this court noted that what counsel provided was *wholly inadequate*.
>
> ….
>
> It is clear to the Court that Dr. Carpenter's new 'competing hypothesis' opinion only came into existence close to trial because Dr. Carpenter's prior expert opinion was *very damaging to defendants*. Based on the foregoing, and pursuant to Practice Book 13-4, this Court finds that (l) defendants *acted in bad faith and intentionally did not disclose the change in Dr. Carpenter's opinions*; (2) plaintiff was severely prejudiced by the late disclosure at trial, especially since plaintiffs expert had finished testifying and returned to California before the new opinion was disclosed and had no way to know of and/or counter Dr. Carpenter's new opinions; and (3) no sanction other than preclusion of this new opinion would have adequately addressed *defendants' abusive conduct*. …. defendants were properly precluded from offering Dr. Carpenter's new opinion"

(*Exhibit 1, Decision Denying Defendants' Motion to Set Aside Verdict and Motion for Remittitur, dated January 29, 2025, by Judge Ozalis [emphasis added]*.)

158. The foregoing preclusions of expert opinion testimony at the trial due to the defendants' omissions and delays, whether by design[11] or error, denied Dr. ELIAS any opportunity to mount an injury causation defense in the *Tigani* case.

**The Verdict and the Continued Mistreatment of Dr. ELIAS**

159. Closing arguments were held in the trial on October 10, 2024. Afterward, the defendants advised Dr. ELIAS not to come to the courthouse the next day because the jury would be deliberating and a verdict would not be returned so soon.

160. The jury returned its verdict the next day, October 11, 2024, around 1:00 p.m. (*Exhibit 10, Verdict Form, dated October 11, 2024, 1:12 p.m.*)

161. The jury's verdict was in the plaintiff's favor and the damages awarded were $30,374,811.98.

162. Attorney COSTA did not call Dr. ELIAS to inform her about the jury's verdict for the plaintiff and the enormous damage award that outstripped the $4,000,000.00 insurance coverage. Instead, COSTA chose to text Dr. ELIAS the following message at 1:36 p.m. to break the bad news:

"Plaintiff verdict re improperly performed surgery. $30,374,811.98".

163. The defendants broke the news about the verdict and financially ruinous damages to Dr. ELIAS in a callous, cruel, and heartless manner that evaded the bounds of human decency. In fact, the defendants never spoke to Dr. ELIAS about the bad outcome of the case.

---

[11] The "design" being an attempted subterfuge designed to take the plaintiff's attorneys by surprise with additional expert opinions at trial; i.e., it was an attempt to "sandbag" Mr. Golub.

**The Persistent Enormous Repercussions of the Verdict for Dr. ELIAS**

164. When Dr. ELIAS received Attorney COSTA's text, she instantly experienced a severe physical and emotional stress reaction that included hyperventilation, pounding pulse, tachycardia, nausea, dry heaves, vomiting, crying uncontrollably, and panic attacks. Her husband was summoned home to attend to her.

165. The $30,000,000.00+ verdict for Ms. Tigani was widely reported by TV news (including local stations), newspapers in Connecticut and New York, online news services, and insurance, medical and legal journals among other media sources. Dr. ELIAS was repeatedly identified as the physician who had committed the malpractice that resulted in the huge damage award. The news media stories and widespread negative publicity about the massive verdict would never have occurred if the *Tigani* case had been timely and properly settled by the defendants and insurer and the claims were consequently withdrawn.

166. Post-verdict interest calculated since the filing of the offers of compromise in 2018 amounted to nearly $20,000,000.00 and judgment was entered against Dr. ELIAS and her employer for $50,000,000.00+/-.

167. As a result of the foregoing, the physical and emotional harm sustained by Dr. ELIAS persisted. She was compelled to take medical leave from work.

168. Dr. ELIAS suffered serious damage to her personal and professional reputation, medical career, and employment prospects. Numerous patients asked her about the *Tigani* verdict and the facts of the case. Dr. ELIAS' relationship with her employer deteriorated. Career advancement opportunities were lost or retracted. She lost significant income. She sustained substantial personal legal expenses for representation to address post-judgment settlement

matters. She became ill and required medical treatment. Her rights as a client were violated. She is a victim of the defendants' deceptive business practices.

169. The plaintiff's verdict, $30,000,000.00+ damage award, consequent widespread publicity about the case, and Dr. ELIAS' injuries, damages, harm and losses were thoroughly avoidable if the defendants had timely and properly performed their professional duties, adhered to the ethical rules, acted in their physician client's best interests, and endeavored to accept the reasonable settlement offers made by Mr. Golub in 2018 and 2024.

**The Post-Trial Motions and the Court's Rulings**

170. The defendants filed motions to set aside the verdict in favor of the plaintiff and for remittitur on or about November 8, 2024. The plaintiff's attorney filed opposition to each motion on or about November 26, 2024. The defendants filed reply briefs on or about December 10, 2024. Simultaneously, the plaintiff's attorney filed a motion for offer of compromise interest. The court heard oral arguments on these motions on December 17, 2024.

171. On January 29, 2025, the court issued a Memorandum of Decision [on] Motion to Set Side Verdict and Motion for Remittitur and Memorandum of Decision [on] Motion for Award of Offer of Compromise Interest and Attorneys' Fee. The court granted the motion for offer of compromise interest which accrued from October 19, 2024 - January 29, 2025 in the amount of $679,762.68 ($6,664.34 per day). The total offer of compromise interest against Dr. ELIAS and WMG was held to be $20,286,238.70.

172. The court's ruling brought the total amount of the judgment to be entered against Dr. ELIAS and WMG to $50,000,000.00+ (i.e., $30,374,811.98+$20,286,238.70= $50,661,400.70.

173. The court's Memorandum of Decision [on] Motion to Set Side Verdict and Motion for Remittitur denied the defendants' motion in its entirety. In the 33-page decision, the court excoriated the defendants for their delays, bad faith, dishonesty, subterfuges and misconduct. (*Exhibit 1, Decision Denying Defendants' Motion to Set Aside Verdict and Motion for Remittitur, dated January 29, 2025, by Judge Ozalis [emphasis added]*.)

174. All attorneys would agree that the court's findings related to the defendants' conduct constitute deviations and departures from standards of legal practice, violations of ethical rules, and breaches of professional decorum.

**FIRST COUNT**
**Legal Malpractice**

175. The plaintiff repeats, reiterates and re-alleges the allegations set forth in paragraphs 1 to 174 above as if fully and completely repeated, reiterated and re-alleged in this paragraph.

176. From on or about September 28, 2016, through to on or about March 30, 2025, the defendants were retained by the professional liability insurer for Dr. ELIAS to be the attorneys defending her in the medical malpractice action known as *Tigani v. Westchester Medical Group, et al.*, and assumed the responsibility as her counsel to zealously represent her and protect her best interests.

177. During the foregoing period of time, an attorney-client relationship existed between the defendants and Dr. ELIAS.

178. The defendants had a duty to represent Dr. ELIAS in accordance with standards of good and accepted legal practice, adhere to their professional responsibilities, comply with the ethical rules, act in her best interests, comport themselves in an appropriate manner, and exercise reasonable care to ensure that she was properly represented.

179. The defendants committed an extensive series of wrongful acts and omissions in their

representation of Dr. ELIAS that constituted deviations and departures from standards of good and accepted legal practice, neglect of their professional responsibilities, violations of ethical rules, derelictions of duty, misfeasance, malfeasance, deceit, subterfuge, and failures to exercise reasonable care.

180. Plaintiff incorporates by reference the defendants' wrongful acts, omissions and conduct set forth in paragraphs 38 – 174 here as some, but not all, of the events and occurrences that constitute the claim asserted in this Count.

181. The defendants repeatedly failed to properly perform their duties as Dr. ELIAS' attorneys.

182. The defendants repeatedly breached their duties as Dr. ELIAS' attorneys.

183. The defendants repeatedly violated their duties as Dr. ELIAS' attorneys.

184. The defendants' foregoing failures, breaches and violations of the duties owed to Dr. ELIAS caused, contributed to and were substantial factors resulting in her injuries, damages, harm and losses.

185. As a result of the foregoing, Dr. ELIAS suffered injuries, damages, harm and losses that include, but are not limited to, the following: serious damage to her personal and professional reputation, medical career and employment prospects, deterioration in the relationship with her employer, lost career advancement opportunities, lost income, legal expenses and violations of her rights as a client.

186. The injuries, damages, harm, and losses sustained by Dr. ELIAS were caused solely and wholly by virtue of the foregoing wrongful acts, omissions and conduct of the defendants and were in no way caused and/or contributed to by her.

187. By reason of the foregoing, plaintiff is entitled to compensatory and punitive damages from the defendants for her injuries, damages, harm and losses.

188. By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $15,000,000.00 in compensatory and punitive damages.

## SECOND COUNT
## Intentional Infliction of Emotional Distress

189. The plaintiff repeats, reiterates and re-alleges the allegations set forth in paragraphs 1 to 188 above as if fully and completely repeated, reiterated and re-alleged in this paragraph.

190. The defendants owed a duty of reasonable care to Dr. ELIAS.

191. Plaintiff incorporates by reference the defendants' wrongful acts, omissions and conduct set forth in paragraphs 38 – 174 here as some, but not all, of the events and occurrences that constitute this Count.

192. The defendants intended to inflict emotional distress on Dr. ELIAS or knew or should have known that their conduct would likely cause or result in severe emotional distress to her.

193. The defendants' conduct was extreme, outrageous and exceeded the bounds of human decency.

194. The defendants' conduct caused, contributed to, and was a substantial factor resulting in Dr. ELIAS' severe emotional distress and related injuries, damages, harm and losses.

195. As a result of the foregoing, Dr. Elias suffered injuries, damages, harm and losses that include, but are not limited to, the following: severe emotional distress and consequent damage to her personal and professional reputation, medical career and employment prospects, deterioration in the relationship with her employer, lost career advancement opportunities, lost income, and medical expenses.

196. The injuries, illnesses, damages, harm, and losses sustained by Dr. ELIAS were caused solely and wholly by virtue of the foregoing wrongful acts, omissions and conduct of the defendants and were in no way caused and/or contributed to by her.

197. By reason of the foregoing, plaintiff is entitled to compensatory and punitive damages from the defendants for her injuries, damages, harm and losses.

198. By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $15,000,000.00 in compensatory and punitive damages.

## THIRD COUNT
## Negligent Infliction of Emotional Distress

199. The plaintiff repeats, reiterates and re-alleges the allegations set forth in paragraphs 1 to 198 above as if fully and completely repeated, reiterated and re-alleged in this paragraph.

200. The defendants owed a duty of reasonable care to Dr. ELIAS.

201. Plaintiff incorporates by reference the defendants' wrongful acts, omissions and conduct set forth in paragraphs 38 – 174 here as some, but not all, of the events and occurrences that constitute this Count.

202. The defendant's conduct created an unreasonable risk of causing emotional distress to Dr. ELIAS.

203. The defendants knew or should have known that their conduct created an unreasonable risk of causing emotional distress to Dr. ELIAS and that, if such emotional distress was caused, it might result in illness or bodily harm to her.

204. Dr. ELIAS' emotional distress was foreseeable.

205. Dr. ELIAS' emotional distress was severe enough that it resulted in illness or bodily harm.

206. The defendants' conduct caused, contributed to, and was a substantial factor resulting in Dr. ELIAS' severe emotional distress and related injuries, damages, harm and losses.

207. As a result of the foregoing, Dr. ELIAS suffered injuries, damages, harm and losses that include, but are not limited to, the following: severe emotional distress and consequent damage to her personal and professional reputation, medical career and employment prospects,

deterioration in the relationship with her employer, lost career advancement opportunities, lost income, and medical expenses.

208. The injuries, illnesses, damages, harm, and losses sustained by Dr. ELIAS were caused solely and wholly by virtue of the foregoing wrongful acts, omissions and conduct of the defendants and were in no way caused and/or contributed to by her.

209. By reason of the foregoing, plaintiff is entitled to compensatory and punitive damages from the defendants for her injuries, damages, harm and losses.

210. By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $15,000,000.00 in compensatory and punitive damages.

**FOURTH COUNT**
**Violations of the Connecticut Unfair Trade Practices Act**

211. The plaintiff repeats, reiterates and re-alleges the allegations set forth in paragraphs 1 to 210 above as if fully and completely repeated, reiterated and re-alleged in this paragraph.

212. The defendants had a statutory duty owed to its clients, including Dr. ELIAS, to conduct the entrepreneurial aspects of the law firm's business in a fair and honest manner.

213. Plaintiff incorporates by reference the defendants' wrongful acts, omissions and conduct set forth in paragraphs 38 – 174 here as some, but not all, of the events and occurrences that constitute this Count.

214. The defendants engaged in unfair and deceptive acts and practices in the conduct of their law practice as it involved their representation of Dr. ELIAS and her employer in the *Tigani* case.

215. The defendants and their partners knowingly, willfully, purposefully and intentionally engaged in a pervasive pattern and practice of deception that included unnecessarily prolonging, protracting and delaying the progress and resolution of cases, mischaracterizing

the defensibility of cases, and misleading insurers about the financial exposure presented by cases to grossly inflate billable hours and generate increased revenue.

216. The defendants' unfair and deceptive acts or practices in this matter encompass, but are not limited to, taking an indefensible case to trial which could have easily been settled months and years before for an amount within the client's insurance coverage.

217. The defendants' unfair and deceptive acts or practices in this matter include recklessly, willfully, knowingly and/or intentionally misrepresenting and mischaracterizing the defensibility of the case and the potential financial exposure to their clients and the insurer.

218. The defendants' unfair and deceptive acts or practices in this matter caused the *Tigani* case to be unnecessarily prolonged, protracted, and delayed for the mere purpose of inflating billable hours and generating exorbitantly increased revenue.

219. The defendants' wrongful acts, omissions and conduct in the *Tigani* case were part and parcel of the foregoing pervasive pattern and practice of deception.

220. The defendants' mishandling of the *Tigani* case caused events to spiral out of control with disastrous financial repercussions for Dr. ELIAS, WMG, and the insurer.

221. The foregoing unfair and deceptive acts or practices involve the entrepreneurial aspects of the defendants' law practice.

222. The defendants violated *C.G.S. §§ 42-110a, et seq.*

223. Dr. ELIAS suffered an ascertainable loss of money and property as a result of the defendants' unfair and deceptive acts or practices.

224. The defendants' conduct caused, contributed to, and was a substantial factor resulting in Dr. ELIAS' economic damages, harm and losses.

225. As a result of the foregoing, Dr. ELIAS suffered damages, harm and losses that include,

but are not limited to, the following: damage to her personal and professional reputation, medical career and employment prospects, deterioration in the relationship with her employer, lost and retracted career advancement opportunities, lost income and legal expenses.

226. The damages, harm, and losses sustained by Dr. ELIAS were caused solely and wholly by virtue of the foregoing wrongful acts, omissions and conduct by the defendants and were in no way caused and/or contributed to by her.

227. By reason of the foregoing, plaintiff is entitled to compensatory and punitive damages, attorneys' fees, and costs from the defendants for her damages, harm and losses.

228. By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $15,000,000.00 in compensatory and punitive damages, attorneys' fees, and costs.

**WHEREFORE,** plaintiff SARA ELIAS, M.D., demands judgment awarding compensatory and punitive damages against the defendants RYAN RYAN DELUCA, LLP, JOHN F. COSTA, and RYAN J. CESARIO on the first, second, third and fourth causes of action in the Complaint in the amount of $15,000,000.00 for each cause of action; attorneys' fees and costs on the fourth cause of action; and the interest, costs and disbursements of the action, together with such other and further relief as the court deems just and proper.

Dated: New York, NY
September 9, 2026

Yours, etc.,

*/s/ J. Lanni*

**JOSEPH LANNI**
THE JACOB FUCHSBERG LAW FIRM, LLP
Attorneys for Plaintiffs
SARA ELIAS, M.D.
3 Park Avenue, 37th Floor

New York, New York 10016
Tel.: 212.869.3500
Fax: 212.398.1532
j.lanni@fuchsberg.com

**JOSEPH LANNI**
c/o Richard J. Margenot, LLC
100 Melrose Ave., Ste. 105
Greenwich, CT 06830

(Please direct all mail, deliveries and communications to the New York office)