# EXHIBIT 1

| | | |
|---|---|---|
| **DOCKET NO. CV-16-6029906-S** | : | **SUPERIOR COURT** |
| **ELIZABETH TIGANI** | : | **J.D. OF STAMFORD/NORWALK** |
| **vs.** | : | **AT STAMFORD** |
| **WESTCHESTER MEDICAL GROUP, P.C., ET AL.** | : | **JANUARY 29, 2025** |

# MEMORANDUM OF DECISION MOTION TO SET ASIDE VERDICT AND MOTION FOR REMITTITUR

## I. PROCEDURAL HISTORY

The parties in this action are the plaintiff, Elizabeth Tigani ("Tigani"), and the defendants Westchester Medical Group, P.C. ("WestMed") and physician Sara B. Elias ("Dr. Elias"). This medical malpractice case was commenced on September 28, 2016, and arises out of a cesarean section performed by Dr. Elias, an employee of WestMed. Tigani alleged in her operative complaint that the improperly performed cesarean section caused her to sustain severe injuries including an avulsion of her uterovaginal wall that tore her uterus apart from her vagina and a large bladder laceration resulting in multiple vesicovaginal fistulas.

A jury trial was conducted in this action for three weeks from September 24, 2024 through October 11, 2024. On October 11, 2024, the jury found that Dr. Elias had breached the standard of care in her failure to perform Ms. Tigani's cesarean section properly and that such deviation proximately caused the injuries suffered by her. The

jury entered a unanimous verdict in Ms. Tigani's favor in the amount of $1,374,811.98[1] in economic damages and $29 million in noneconomic damages ($5 million for her past/future physical injuries, $5 million for past/future physical pain and suffering, and $19 million for the past/future loss of enjoyment of her normal life's activities) as against defendants WestMed and Dr. Elias.

Pursuant to Practice Book §§ 16-35 and 17-2A, on November 8, 2024, defendants filed separate motions to set aside the verdict in favor of plaintiff and for remittitur. Plaintiff filed an opposition to each of the aforesaid motions on November 26, 2024, and defendants filed reply briefs on December 10, 2024. Defendants have moved to set aside the verdict on the grounds: (1) that they were precluded from offering a new alternative theory of the mechanism of injury during the cesarian section; and (2) because the verdict was excessive and shocked the conscience. With respect to the alternative theory of the mechanism of injury, defendants argue that they were precluded from offering a second new "expert causation opinion" from Dr. Elias and were precluded from offering new expert causation opinions of Dr. Carpenter, defendants' original standard of care and causation expert. Defendants also moved for an order of remittitur, arguing that the award for noneconomic damages was excessive, unjust and entirely disproportionate. Oral argument was heard on these motions on December 17, 2024.

---

[1] Defendants are not asking this court for remittitur on the economic damages awarded to plaintiff and have conceded that the amounts awarded for surrogacy costs and medical bills were proper.

## II.

## FACTUAL BACKGROUND

The court finds the credible facts as follows after a three week trial in this matter.

Ms. Tigani had a normal, uneventful pregnancy prior to the emergency cesarean section performed by Dr. Elias. She was admitted to Greenwich Hospital after her water broke at approximately 4 a.m. on December 6, 2014. Later that evening, Ms. Tigani was in active labor for over four hours, which subsequently stalled. At approximately 2:30 a.m. on December 7, 2014, Dr. Elias performed a cesarean section on Ms. Tigani. Plaintiff's obstetrical expert, obstetrician-gynecologist Vasilki Tatsis, credibly testified that during the cesarean section, Dr. Elias negligently caused the fingers of her hand to rip into and avulse, or tear apart, Ms. Tigani's uterovaginal wall, resulting in the tearing away of the uterus from the vagina. (9/25/24 Trial Tr. 62, 67.) Dr. Tatsis described this avulsion injury as the equivalent of a partial hysterectomy. (Id. 63.) The tearing away of the uterus was so extensive that the cervix could be visualized. (Id., 42.) Simultaneously, Dr. Elias scraped her hand across the entire back side of Ms. Tigani's bladder with her hand, creating a large laceration going from the back side of the bladder dome all the way across to the neck of the bladder. (Id., 67.) The resulting hole in the bladder was so large that the catheter in the bladder could be visualized. (Id., 43.)

The Court credits the following testimony. Because of the extent of the injuries inflicted, it took six hours and multiple surgeries immediately after the cesarean section to repair Ms. Tigani's uterus and bladder. (10/1/24 Trial Tr. 18-19.) Ms. Tigani was kept

awake by the surgical staff during these six hours of surgical repair in the operating room and was only given an epidural. After the surgery, Ms. Tigani's uterus was weakened, putting her at risk of uterine rupture if she became pregnant again, and permanently impairing her ability to bear children. (9/25/24 Trial Tr. 21.) Ms. Tigani was also sent to the ICU after the surgery. Tigani described the six-hour surgery immediately following her cesarean section in detail, describing the substantial pain and discomfort she suffered throughout it. (10/1/24 Tr. 16-19.) After the six hour repair surgery, Tigani was told by the urological surgeon who operated on her that she could never have children again.

Ms. Tigani's ability to care for her newborn child was severely impaired because of her injuries. (10/1/24 Trial Tr. 23.) She was not able to see or hold her newborn or have any skin to skin contact. (10/2/24 Trial Tr. 40.) In and after discharge from the hospital, rather than being able to enjoy caring for her newborn baby, she was largely confined to bed and unable to tend to the baby's needs. (10/1/24 Trial Tr. 21-25.) She was unable to breast feed and had to carry around a catheter bag. (Id., 26.)

After Ms. Tigani was discharged from the hospital, she contracted a serious infection, c. dificile, continued to have urinary tract infections, and continued to have constant leakage of urine despite having a catheter in place. (10/1/24 Trial Tr. 26-27, 42; 9/26/24 Trial Tr. 33-34, 37.) For over a month after her injuries, she was extremely weak, ill, and dealing with immense nausea. (10/1/24 Trial Tr. 23-24.) At the same time, Ms. Tigani was experiencing the discomfort of constant leakage of large amounts of urine even with a catheter in place. (9/26/24 Trial Tr. 33-34, 37.) The infection she contracted

shortly after being discharged from the hospital made her even sicker and caused painful stomach cramping and nausea. (10/1/24 Trial Tr. 26-27.)

The injury to Ms. Tigani's bladder caused her to develop a large vesicovaginal fistula (approximately 10 millimeter in size) as well as a small fistula, both of which required surgical repair. (9/26/24 Trial Tr. 39-40, 59-60.) The surgery was performed by Ms. Tigani's treating urologist, Nirit Rosenblum ("Dr. Rosenblum"), a Professor and attending urologist at NYU Langone Medical Center, and required grafting of a portion of Ms. Tigani's labia, leaving her with permanent numbness and disfigurement. (Id., 59.)

Although the fistula surgery successfully repaired the fistula, the injuries Ms. Tigani suffered during the cesarean section permanently damaged her pelvic floor muscles, resulting in continuing daily pain and discomfort. (Id., 61.) To avoid worsening her condition, Ms. Tigani has been required to undertake weekly physical therapy since 2015 just to maintain the damaged pelvic muscles. (10/2/24 Trial Tr. 34-35.)

The credible evidence at trial showed that Ms. Tigani's damaged pelvic muscles cause a constriction of the opening of Ms. Tigani's vagina, which creates pain during sexual intercourse. (10/1/24 Trial Tr. 42.) Because of the increased tension and injury to her pelvic muscles, urine continues to be trapped in her vagina and leaks out spontaneously without warning. (9/26/24 Trial Tr. 9, 11.) The urine leakage occurs on a daily basis, at random unpredictable times, and varies in unpredictable volumes. (Id., 9.) The trapping of urine was objectively credibly confirmed by Dr. Rosenblum through fluoroscopy. Additionally, bacteria collecting in the vagina causes Ms. Tigani to suffer

frequent, highly painful urinary tract infections (approximately eight per year). (10/2/24 Trial Tr. 5.)

Ms. Tigani credibly testified that she has daily pain and discomfort to her pelvic floor muscles from the injury. She requires invasive physical therapy that involves the physical manipulation of the muscles inside her vagina in an attempt to maintain the muscles in their damaged status. (10/1/24 Trial Tr. 36.) The damaged pelvic floor muscles cause painful constriction of the opening to Ms. Tigani's vagina. (10/1/24 Trial Tr. 42, 46.) This constriction causes pain during intercourse. (Id.) Ms. Tigani testified as to the dramatic change in her sexual relationship with her husband caused by the pain at the vaginal opening, as well as the problems with urine leakage. (10/1/24 Trial Tr. 44.) She also credibly testified that the leakage and pain dramatically decreased the frequency of sexual relations, that she needed to put a towel down on the bed before engaging in intercourse, urinate prior to intercourse, shower and clean her vagina afterward, urinate again, and then take medication. (Id., 45-46.) Ms. Tigani was thirty-two years old at the time of the cesarean-section injury, and three years into her marriage.

Ms. Tigani credibly testified that her injuries seriously impacted virtually all aspects of her daily experience and quality of life, including the loss of the ability to bear further children, which she looked forward to in her life. The evidence before the jury was that Ms. Tigani enjoyed being pregnant and engaging with her unborn child while carrying her. She also enjoyed the ultrasound appointments and the feeling of the baby inside her. As a result of the negligent performance of the cesarean section, Ms. Tigani

lost the ability to enjoy these aspects of child bearing. She had to experience the pregnancies of her other children through a surrogate. The jury awarded Ms. Tigani her surrogacy expenses for the carrying and the birth of her other three children.

Ms. Tigani was thirty-two years old at the time of the cesarean section and a healthy, active woman. (10/1/24 Trial Tr. 12.) She endured the above-described injuries for nearly ten years prior to trial and has a life expectancy of thirty-nine years. (10/2/24 Trial Tr. 35-36.)

The jury awarded Ms. Tigani $5 million for her past and future physical injuries, $5 million for past and future physical pain and suffering, and $19 million for the forty-nine years of interference with and loss of the enjoyment of life's activities.[2]

## III.

## DISCUSSION

Both defendants have each respectively moved: (1) to set aside the verdict; and (2) for remittitur.

---

[2] Plaintiff did not seek, nor did the jury award damages for emotional distress. The jury was repeatedly instructed that there was no claim for emotional distress damages in this case.

### A. **Motion to Set Aside Verdict**

A motion to set aside or open a civil judgment is governed by General Statutes § 52-212a[3] and Practice Book § 17-4.[4] "The setting aside of a verdict can occur for two general reasons. First, a trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury, mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be applied. . . . Second, a verdict may be set aside if its result justifies a suspicion that a juror or jurors were influenced by prejudice, corruption or partiality." (Citation omitted.) *Novak* v. *Scalesse*, 43 Conn. App. 94, 97–98, 681 A.2d 968, cert. granted, 239 Conn. 925, 682 A.2d 1004 (1996).

"The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some

---

[3] General Statutes § 52-212a provides in relevant part as follows: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which the notice of judgment or decree was sent."

[4] Practice Book § 17-4 provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, any civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which notice was sent."

mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, [the appellate court] shall not disturb." (Internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 702, 900 A.2d 498 (2006), citing *Edmands* v. *CUNO, Inc.*, 277 Conn. 425, 452–53, 892 A.2d 938 (2006). "This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury." (Internal quotation marks omitted.) *Madigan* v. *Housing Authority*, 156 Conn. App. 339, 349, 113 A.3d 1018 (2015).

"[I]t is not the function of this court to sit as the seventh juror when . . . review[ing] the sufficiency of the evidence . . . rather, [the court] must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the *most favorable* construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Emphasis in original; internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, supra, 278 Conn. 704.

"Whether [the evidence presented at trial] is sufficient is a question for the jury to decide. . . . The judge decides whether there is any evidence to support the verdict. . . . It is also within the province of the jury to determine the credibility and the effect to be

given the testimony. . . . Moreover, it is the jury's right to consider evidence, draw logical deductions and make reasonable inferences from facts proven. . . . The jury decides the questions of fact. . . . It may accept or reject the testimony of any witness . . . and determine the weight to be given the evidence." (Citations omitted.) *Carfora* v. *Globe, Inc*., 5 Conn. App. 526, 529, 500 A.2d 958 (1985), cert. denied, 198 Conn. 804, 503 A.2d 1186 (1986).

**1. The Court's Preclusion of Dr. Elias' Expert Testimony**

WestMed and Dr. Elias have first moved to set aside the verdict on the ground that this court improperly precluded expert causation opinion testimony from Dr. Elias on the mechanism of injury.

The following history on this issue is relevant to the Court's determination. Prior to September 2024, Dr. Elias was never disclosed as a causation expert by defendants. As of September 4, 2024, the only disclosed expert on standard of care and causation of Ms. Tigani's operative injuries was Dr. Carpenter. Dr. Carpenter's deposition testimony on those issues given earlier in 2024 was very damaging for defendants. Dr. Carpenter testified in his deposition that Dr. Elias committed "surgical error" during the performance of the cesarean section by "mistakenly" placing her hand outside the uterine incision and had, through the blunt force of her fingers outside the uterus, caused the injuries Ms. Tigani sustained to her uterovaginal wall and bladder. (Carpenter Dep. 138-39, 142-43.) This testimony was offered into evidence at trial by plaintiff. (Pl. Ex. 10.)

Dr. Carpenter offered this testimony with full knowledge that Dr. Elias believed her hand was inside the uterus at the time she delivered the baby's head. Dr. Carpenter testified in his March 2024 deposition that he was "extremely confident" that Dr. Elias thought her hand was inside the uterine incision during the procedure and was equally "quite confident" she was mistaken. (Id., 139.) At his deposition, a mere six months prior to trial, Dr. Carpenter testified that Ms. Tigani's injuries to her uterovaginal wall and bladder had been caused by Dr. Elias' hand outside the uterus and that if she had kept her hand consistently inside the uterus, the injuries would not have occurred. (Id., 138-39.) Dr. Carpenter testified that Dr. Elias' hand "mistakenly perforated the wall between the uterus and the vagina and then struck the back of the bladder, injuring the back of the bladder." (Id., 139.) He further testified at his deposition that "if [Dr. Elias] had put her hand consistently inside the uterus" and "never created force outside the anterior uterine wall" the large avulsion separating the uterus and vagina would not have occurred. (Id., 159.) Thus, at his deposition in March 2024, Dr. Carpenter gave his causation opinion based on the facts that Dr. Elias thought her had was inside the uterine incision, but he was quite confident it was outside the uterine incision due to the nature of the injuries. Dr. Carpenter testified at his deposition, that Dr. Elias' surgical error should not be considered a violation of the standard of care because the delivery was difficult and she had not committed the error *intentionally*. (Id., 143.)

Plaintiff's standard of care and causation expert, Dr. Tatsis, testified similarly with Dr. Carpenter at her deposition with respect to how the injury occurred, but disagreed

with Dr. Carpenter's contention that because such injury was not intentional, it was not a deviation in the standard of care.

Plaintiff filed a motion in limine on August 21, 2024, to preclude expert testimony from nondisclosed experts, including Dr. Elias. This court held oral argument on motions in limine on September 9, 2024. For the first time in this eight-year old case, counsel for WestMed and Dr. Elias argued that Dr. Elias should also be permitted to give standard of care expert testimony. Neither during oral argument nor in their opposition papers to this motion in limine did defendants ever suggest to the Court or plaintiff's counsel that Dr. Elias would give causation expert opinions at trial. As set forth above, defendants had previously disclosed a standard of care and causation expert, Dr. Carpenter, earlier in 2024 along with two urological experts.

The Court granted plaintiff's motion in limine in part and did not permit Dr. Elias to give standard of care expert testimony as defendants had already disclosed and intended to call at trial a standard of care expert. The Court, however, did permit Dr. Elias to give limited expert opinion testimony as to what *her understanding of the standard of care was in December 2014* when she performed the cesarean section on Ms. Tigani to help explain her basis for the treatment she provided to Tigani. At oral argument, the court very specifically limited any expert testimony from Dr. Elias to that subject matter. The Court directed defendants to disclose Dr. Elias' knowledge of the standard of care at the time of her treatment of Ms. Tigani in 2014 and produce Dr. Elias for her deposition on these opinions.

Notwithstanding the Court's specific and direct rulings and instructions to defendants' counsel regarding what expert opinions Dr. Elias could offer, on September 11, 2024, defendants filed an expert disclosure for Dr. Elias which included a causation expert opinion that directly contradicted Dr. Carpenter's causation opinion. Dr. Elias' deposition was conducted on September 17, 2024. At that deposition, plaintiff's counsel learned that defendants intended to have Dr. Elias testify at trial on her causation theory. Plaintiff promptly filed on September 23, 2024, a motion in limine to preclude Dr. Elias' newly disclosed expert causation opinion on the grounds that defendants' attempt to present these expert opinions from Dr. Elias had not been authorized by the Court's September 9, 2024 order and that the opinions were scientifically unsupported and invalid. Two days later, the Court granted plaintiff's motion and agreed with plaintiff that defendants' disclosure violated the Court's previous order that had only permitted Dr. Elias to offer expert testimony on her understanding of the standard of care in 2014. This Court also found that defendants had already disclosed a causation expert that had been properly deposed by plaintiff and whom defendants intended to call to testify at trial. The Court reiterated that as of September 9, 2024, defendants were not given permission to disclose a new causation expert. Defendants did not present any reason to the Court as to why they had delayed until the eve of trial in disclosing Dr. Elias on causation. The Court held that under these circumstances, the preclusion of Dr. Elias' causation expert testimony was appropriate. See *Smart* v. *Corbitt*, 126 Conn. App. 788, 797, 14 A.3d 368, cert. denied, 301 Conn. 907, 19 A.3d 177 (2011) (upholding trial court's preclusion of

expert that was disclosed "only four to five weeks prior to jury selection"); *Vitone* v. *Waterbury Hospital*, 88 Conn. App. 347, 356–57, 869 A.2d 672 (2005) (upholding trial court's decision to preclude expert that was not disclosed until six weeks before trial); *Opotzner* v. *Bass*, 63 Conn. App. 555, 568, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001), and cert. denied, 259 Conn. 930, 793 A.2d 1086 (2002) (upholding trial court's redaction of new opinions from expert report that were disclosed for first time on eve of trial).

Defendants also argue in their motion to set aside the verdict that since plaintiff did not object immediately to Dr. Elias' newly disclosed expert opinion rendered on September 11, 2024, she waived her right to object to such new causation opinion. This argument is unavailing for the following reasons. First, Dr. Elias' new expert causation opinion was not disclosed until September 11, 2024, in the middle of jury selection. Second, the deposition of Dr. Elias regarding such disclosure took place less than one week later on September 17, 2024. Shortly thereafter, on September 23, 2024, plaintiff filed a motion to preclude such causation opinions and attached transcript portions from Dr. Elias' September 17, 2024 deposition. The Court finds that plaintiff never waived her objection to Dr. Elias' new causation opinion and timely objected.

Moreover, it is clear that as of September 11, 2024, defendants already had disclosed an expert on causation as to how Ms. Tigani's operative injuries occurred, Dr. Carpenter, whom defendants intended to call at trial. Under the October 5, 2023 scheduling order, defendants were required to disclose their experts by January 5, 2024,

and to produce experts for their deposition by March 5, 2024. Defendants did not disclose Dr. Elias' causation expert opinions at that time. Defendants argue that because Dr. Elias was a treating physician, they were not required to formally disclose her causation expert opinions given that Dr. Elias' operative report gave fair notice of Dr. Elias' causation opinion. Defendants argument is incorrect for the following reasons.

Practice Book § 13-4 (b) (2) provides in relevant part: "If the witness to be disclosed hereunder is a health care provider who rendered care or treatment to the plaintiff, and the opinions to be offered hereunder are based on that provider's care or treatment, then the disclosure obligations under this section may be satisfied by disclosure to the parties of the medical records and reports of such care and treatment. *A witness disclosed under this subsection shall be permitted to offer expert opinion testimony at trial as to any opinion as to which fair notice is given in the disclosed medical records or report. Expert testimony regarding any opinion as to which fair notice is not given in the disclosed medical records or reports must be disclosed in accordance with subsection (1) or subsection (b) of this section.*" (Emphasis added.) After review of the medical records, including the operative report, it is undisputed that there is no reference to Dr. Elias' sheering theory causation opinion or that this is how Tigani's operative injuries occurred. Defendants' contention that this operative report provides fair notice concerning the cause of plaintiff's injuries is without merit. Because Dr. Elias' medical records did not provide fair notice of how Dr. Elias believed Tigani's injuries occurred, defendants were required pursuant to Practice Book § 13-4 (b) (1) to timely disclose Dr.

Elias as an expert and to timely disclose her causation expert opinions. Defendants did neither. Thus, this Court concludes that defendants' argument is unavailing and that Dr. Elias should have been properly and timely disclosed. As she was not, the Court properly precluded her expert causation opinion testimony.

While the motion to preclude Dr. Elias' causation testimony and opinions was granted, the Court notes that Dr. Elias was still able to testify for two days as to what she did and what occurred during the cesarean section, and she was able to offer an explanation of how the operative injuries to Tigani occurred.

Based on the foregoing, the Court finds that (1) defendants purposefully and unreasonably delayed disclosing Dr. Elias' expert causation opinion until the eve of trial; (2) plaintiff was severely prejudiced by the late disclosure and had no way to prepare to counter Dr. Elias' shearing theory of causation; (3) at the time of trial, this case was eight years old and had been continued many times; (4) Dr. Elias was still able to testify as to what she did and what occurred during the cesarean section; (5) defendants had another causation expert disclosed and ready to testify at trial; and (6) no sanction other than preclusion of Dr. Elias' late disclosed expert causation opinion would have adequately addressed defendants' late disclosure. Accordingly, defendants' motion to set aside the verdict on this ground is denied.

**2. <u>The Court's Preclusion of Carpenter's Expert Testimony</u>**

WestMed and Dr. Elias have also moved to set aside the verdict on the grounds that this court improperly precluded expert causation opinion testimony from Dr. Carpenter on the mechanism of injury.

Not only was a new causation expert opinion disclosed by Dr. Elias, on the eve of trial, but defendants also sought to introduce new causation expert opinions from Dr. Carpenter—*after plaintiff rested her case*. Defendants did not disclose Dr. Carpenter's new causation opinions until October 8, 2024, after plaintiff's standard of care and causation expert had testified in the trial and left the state.

At the request of plaintiff's counsel on the day Dr. Carpenter was to testify at trial, this Court specifically asked defendants' counsel whether Dr. Carpenter would be offering any new expert opinions other than those previously disclosed in his expert disclosure and at his deposition. The response given to the Court was "[n]ot that I am aware of, Your Honor." This answer would prove to be false.

Shortly after Dr. Carpenter took the stand at trial, it quickly became clear that he was going to offer not only a new expert causation opinion that deviated significantly from his prior damaging causation opinions, which had been played to the jury by plaintiff, but also new expert opinions on urological injuries plaintiff suffered. Specifically, Dr. Carpenter was now going to opine that instead of the injury to plaintiff being caused by Dr. Elias' hand *being outside the uterus*, he was now going to opine, for the first time in this eight year old case, that the injury was caused by her hand *being*

*inside the uterus and the blunt force that she exerted inside the uterus.* (10/8/24 Trial Tr. 19-20.)

At trial, it became evident that the timing of when Dr. Carpenter discovered that he had these new opinions, which deviated significantly from his prior disclosed expert opinions, was suspect. Defendants presented to the Court that Dr. Carpenter first came up with these opinions on causation after Dr. Elias testified at trial. In particular, Dr. Carpenter said he only found out facts giving rise to these new opinions after reviewing trial transcripts personally delivered to his Rhode Island house by defendants' counsel. Those alleged unknown new facts were: (1) that Dr. Elias claimed her hand was always inside the uterine incision; and (2) he had no prior information on the meaning of Dr. Elias' reference in her operative report to "multiple attempts" to deliver the baby. However after questioning by the court outside the presence of the jury, it was clear that Dr. Carpenter knew those facts long before Dr. Elias testified at trial, had reviewed Dr. Elias' deposition transcript that referred to both issues in detail, and had a lengthy phone conversation with Dr. Elias and counsel approximately one month prior to trial regarding these issues.

Dr. Carpenter also admitted that he had multiple meetings with defendants' counsel prior to his trial testimony where they discussed his change of opinion, one of which occurred one month prior to trial. Dr. Carpenter also admitted that he had met with defendants' counsel and discussed a "competing hypothesis" opinion. It is undisputed that defendants' counsel never contacted plaintiff's counsel regarding Dr. Carpenter's

new "competing hypothesis" theory, never disclosed it, and, in fact, denied to this court that Dr. Carpenter had new opinions on the day Dr. Carpenter was to take the stand. No updated expert disclosure was filed by defendants. By the end of Dr. Carpenter's first day of testimony at trial, neither the Court nor plaintiff had a clear idea of the exact substance of this new opinion. In an effort to find out the exact details of this new "competing hypothesis" opinion, this Court ordered defendants' counsel to send plaintiff's counsel by 8 p.m. on October 8, 2024, "in writing, the opinions that Carpenter was going to offer, the new opinion . . . because nobody knows what it is." (10/8/24 Trial Tr. 35.) The e-mail sent by defendants' counsel that evening in accordance with the Court's order completely failed to set forth specifically what the new opinion was and, the following day, this court noted that what counsel provided was wholly inadequate.

Defendants argue that notwithstanding the foregoing, they still should have been permitted to offer Dr. Carpenter's new expert causation opinion testimony without any specific disclosure because: (1) plaintiff opened the door to testimony by Dr. Carpenter about his change of opinion; and (2) defendants should have been permitted to impeach their own expert under § 6-10 (b) of the Connecticut Code of Evidence.

With respect to defendants' first argument, the Court stated on the record at the end of trial on October 8, 2024, that it believed the door had been opened by plaintiff for defendants to ask questions of Dr. Carpenter on this new "competing hypothesis" theory. However, the record is also clear that on the evening of October 8, 2024, this Court reviewed its notes from trial that day and determined that plaintiff had not opened the

door to this topic. In fact, it was Dr. Carpenter who testified about a "competing hypothesis" theory in answer to a question asked by defendants' counsel. This was corroborated by the daily transcript of trial testimony counsel were receiving. Before trial began on October 9, 2024, this Court advised counsel of its conclusion that plaintiff had not opened the door and vacated its decision permitting Dr. Carpenter to testify further on this issue. As our Appellate Court has explained "[t]he party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." *Tiplady* v. *Maryles*, 158 Conn. App. 680, 692, 120 A.3d 528, cert. denied, 319 Conn. 946, 125 A.3d 527 (2015). Thus, because plaintiff had not opened the door, this Court finds that it properly determined that defendants could not further question Dr. Carpenter on the "competing hypothesis" theory.

Defendants next argue that they were improperly precluded from examining and impeaching Dr. Carpenter under Connecticut Code of Evidence § 6-10 (b), which pertains to prior inconsistent statements of witnesses, and that such preclusion merits the setting aside of the verdict. This Court finds such argument to be unavailing. Section 6-10 (b) provides in relevant part: "[i]n examining a witness concerning a prior inconsistent statement, whether written or not, made by the witness, the statement should be shown to or the contents of the statement disclosed to the witness at that time." Conn. Code Evid. § 6-10 (b). Defendants did question Dr. Carpenter on his prior expert opinion at trial.

What they were not able to do was offer into evidence Dr. Carpenter's new "competing hypothesis" opinion, which opinion was never properly disclosed to plaintiff pursuant to Practice Book § 13-4.

It is clear to the Court that Dr. Carpenter's new "competing hypothesis" opinion only came into existence close to trial because Dr. Carpenter's prior expert opinion was very damaging to defendants. Based on the foregoing, and pursuant to Practice Book § 13-4 (h),[5] this Court finds that (1) defendants acted in bad faith and intentionally did not disclose the change in Dr. Carpenter's opinions; (2) plaintiff was severely prejudiced by the late disclosure at trial, especially since plaintiff's expert had finished testifying and returned to California before the new opinion was disclosed and had no way to know of and/or counter Dr. Carpenter's new opinions; and (3) no sanction other than preclusion of this new opinion would have adequately addressed defendants' abusive conduct. Given that defendants were properly precluded from offering Dr. Carpenter's new opinion, defendants' motion to set aside the verdict on this ground is denied.

---

[5] Practice Book § 13-4 (h) provides: "A judicial authority may, after a hearing, impose sanctions on a party for failure to comply with the requirements of this section. An order precluding the testimony of an expert witness may be entered only upon a finding that: (1) the sanction of preclusion, including any consequence thereof on the sanctioned party's ability to prosecute or to defend the case, is proportional to the noncompliance at issue, and (2) the noncompliance at issue cannot adequately be addressed by a less severe sanction or combination of sanctions."

### 3. New Causation Urological Opinion Testimony by Dr. Carpenter

WestMed and Dr. Elias have also moved to set aside the verdict on the ground that this Court improperly precluded expert causation opinion testimony from Dr. Carpenter on Ms. Tigani's pelvic floor injuries and incontinence from urine trapping.

On October 8, 2024, the same day defendants sought to offer new causation opinion testimony from Dr. Carpenter on the injuries suffered by Ms. Tigani during the cesarean section, defendants also disclosed (after first denying that Dr. Carpenter had any new expert opinions) that Dr. Carpenter was going be defendants' new causation expert as to Ms. Tigani's urological pelvic floor and incontinence issues. The Court notes that defendants had properly disclosed two urological experts, Dr. Milena Weinstein and Dr. Jeffrey Gorelick, to testify as to Ms. Tigani's pelvic floor injuries and incontinence issues. Both of these experts had been deposed; acknowledged that Ms. Tigani's treating urologist Dr. Rosenblum was highly regarded; testified that they had never seen Ms. Tigani and would defer to Dr. Rosenblum's opinions about Ms. Tigani's injuries. (Dep. of M. Weinstein pp. 77-79, 82-83, 98-101; Dep. of J. Gorelick pp. 80-87.) Both experts, however, were pulled by defendants from testifying at trial shortly before trial started. Moreover, defendants' counsel advised plaintiff's counsel that instead of calling their expert urological causation experts on these issues, they would rely on cross-examination of plaintiff's expert, Dr. Rosenblum, to contest Ms. Tigani's urological injuries. Instead, defendants sought to elicit from Dr. Carpenter new undisclosed expert causation opinions with respect to Tigani's urological pelvic floor and incontinence issues.

Dr. Carpenter admitted at trial, outside the presence of the jury, that he was first asked to render these opinions in September 2024, but defendants gave no notice to plaintiff of their intent to elicit such opinions from Dr. Carpenter at trial. Defendants argued at trial that Dr. Carpenter had been disclosed on these issues, but a review of Dr. Carpenter's expert disclosure shows otherwise. In that expert disclosure, Dr. Carpenter disclosed two opinions concerning Ms. Tigani's post-surgery obstetrical issues: (1) that she had a low risk of uterine rupture and was, thus, capable of conceiving and delivering a baby safely; and (2) that she would have sustained the same operative injuries even if the cesarean section had been performed earlier. (Dr. Carpenter Expert Disclosure dated February 13, 2024, Docket No. 283.) The expert disclosure does not mention or address any opinions concerning Ms. Tigani's pelvic floor or incontinence issues. In response to this court's questioning outside the presence of the jury, Dr. Carpenter admitted that he had formed no opinions on those issues until approximately one month prior to trial. (10/9/24 Trial Tr. 37-39.) Thus, since Dr. Carpenter did not formulate these opinions until seven months after his expert disclosure was filed, it is clear his expert disclosure filed with this Court could not have set forth these opinions.

Based on the foregoing, and pursuant to Practice Book § 13-4 (h), this Court finds that (1) defendants acted in bad faith and intentionally did not disclose Dr. Carpenter's new urological causation expert opinions; (2) plaintiff was severely prejudiced by the late disclosure at trial, especially since plaintiff's expert had finished testifying and returned to New York before the new opinions were disclosed and had no way to know of and/or

counter Dr. Carpenter's new opinions; and (3) no sanction other than preclusion of this new opinion would have adequately addressed defendants' conduct. Thus, the Court finds that the preclusion of Dr. Carpenter's testimony on these opinions pursuant to Practice Book § 13-4 was warranted and defendants' motion to set aside the verdict on this ground is denied.

**B. Motion for Remittitur/Motion to Set Aside Excessive Verdict**

WestMed and Dr. Elias next move to set aside the verdict and/or for remittitur of the jury's award of $29 million in noneconomic damages to Tigani. Defendants argue that the noneconomic damages portion of the verdict was excessive as a matter of law and that it shocked the conscience. WestMed and Dr. Elias are not moving for remittitur or to set aside the economic damages award of $1, 374,811.98 in favor of Tigani.

"The right of trial by jury is of ancient origin, characterized by Blackstone as the glory of the English law and the most transcendent privilege which any subject can enjoy . . . . [T]he award of damages . . . is a matter peculiarly within the province of the trier of facts. . . . [A] court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances." (Citations omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 280, 32 A.3d 318 (2011).

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to

the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Citations omitted; internal quotation marks omitted.) Id.,281.

The "shocks the sense of justice standard" is "intended to convey the extraordinary departure from reasonableness that is required before a court properly may exercise its authority to set aside the jury's award of damages. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [A] trial court should exercise its discretion to order remittitur only in cases where very clear, definite and satisfactory reasons can be given for such interference. . . . [To issue a remittitur, the trial court] must have laid before us a very clear and striking case of indubitable wrong, so clear and striking as to indicate the influence of undue sympathy, prejudice or corruption on the verdict." (Citations omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, supra, 303 Conn. 283.

"The amount of a damage[s] award is a matter peculiarly within the province of the trier of fact . . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls

somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the [trier of fact] was influenced by partiality, prejudice, mistake or corruption." (Emphasis omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon,* 347 Conn. 58, 69, 295 A.3d 919 (2023).

The trial in this matter lasted three weeks with extensive testimony from physicians, Tigani, and her husband as to what Tigani endured and continues to endure and suffer as a result of the negligently performed cesarean section.

In reviewing the evidence in the light most favorable to sustaining the verdict, the court finds as follows. Ms. Tigani had a normal uneventful pregnancy prior to the emergency cesarean section performed by Dr. Elias. She was admitted to Greenwich Hospital after her water broke at approximately 4 a.m. on December 6, 2014. Later that evening, Tigani was in active labor for over four hours, which subsequently stalled. At approximately 2:30 a.m. on December 7, 2014, Dr. Elias performed a cesarean section on Ms. Tigani. Plaintiff's obstetrical expert, Dr. Tatsis, testified that during the cesarean section, Dr. Elias negligently caused the fingers of her hand to rip into and avulse, or tear apart, Ms. Tigani's uterovaginal wall, resulting in the tearing away of the uterus from the vagina. (9/25/24 Trial Tr. 62, 67.) Dr. Tatsis described this avulsion injury as the *equivalent of a partial hysterectomy.* (Id. 63.) The tearing away of the uterus was so extensive that the cervix could be visualized. (Id., 42.) Simultaneously, Dr. Elias scraped her hand across the entire back side of Ms. Tigani's bladder with her hand, creating a

large laceration going from the back side of the bladder dome all the way across to the neck of the bladder. (Id., 67.) The resulting hole in the bladder was so large that the catheter in the bladder could be visualized. (Id., 43.)

Because of the extent of the injuries inflicted, it took six hours and multiple surgeries immediately after the cesarean section to repair Tigani's uterus and bladder. (10/1/24 Trial Tr. 18-19.) Ms. Tigani was kept awake by the surgical staff during these six hours of surgical repair in the operating room and was only given an epidural. After the surgery, Ms. Tigani's uterus was weakened, putting her at risk of uterine rupture if she became pregnant again, and permanently impairing her ability to bear children. (9/25/24 Trial Tr. 21.) Ms. Tigani was sent to the ICU after the surgery. Ms. Tigani described the six-hour surgery immediately following her cesarean section in detail, describing the substantial pain an discomfort she suffered throughout it. (10/1/24 Tr. 16-19.) After the six-hour repair surgery, Ms. Tigani's husband was told by the urological surgeon who operated on her that she could never have children again.

Ms. Tigani's ability to care for her newborn child was severely impaired because of her injuries. (10/1/24 Trial Tr. 23.) She was not able to see or hold her newborn or have any skin to skin contact. (10/2/24 Trial Tr. 40.) In and after discharge from the hospital, rather than being able to enjoy caring for her newborn baby, she was largely confined to bed and unable to tend to the needs of her baby. (10/1/24 Trial Tr. 21-25.) She was unable to breast feed and had to carry around a catheter bag. (Id., 26.)

After Ms. Tigani was discharged from the hospital, she contracted a serious infection, c. dificile, continued to have urinary tract infections, and continued to have constant leakage of urine despite having a catheter in place. (10/1/24 Trial Tr. 26-27, 42; 9/26/24 Trial Tr. 33-34, 37.) For over a month after her injuries, she was extremely weak, ill, and dealing with immense nausea. (10/1/24 Trial Tr. 23-24.) At the same time, Ms. Tigani was experiencing the discomfort of constant leakage of large amounts of urine even with a catheter in place. (9/26/24 Trial Tr. 33-34, 37.) The infection she contracted shortly after being discharged from the hospital made her even sicker and caused painful stomach cramping and nausea. (10/1/24 Trial Tr. 26-27.)

The injury to Ms. Tigani's bladder caused her to develop a large vesicovaginal fistula (approximately 10 millimeters in size) as well as a small fistula, both of which required surgical repair. (9/26/24 Trial Tr. 39-40, 59-60.) The surgery was performed by Ms. Tigani's treating urologist, Dr. Rosenblum, and required grafting of a portion of Ms. Tigani's labia, leaving her with permanent numbness and disfigurement. (Id., Tr. 59.)

Although the fistula surgery successfully repaired the fistula, the injuries Ms. Tigani suffered during the cesarean section permanently damaged her pelvic floor muscles, resulting in continuing daily pain and discomfort. (Id., 61.) To avoid worsening her condition, Ms. Tigani has been required to undertake weekly physical therapy since 2015 just to maintain the damaged pelvic muscles. (10/2/24 Trial Tr. 34-35.)

The evidence at trial showed that Ms. Tigani's damaged pelvic muscles cause a constriction of the opening of her vagina, which creates pain during sexual intercourse. (10/1/24 Trial Tr. 42.) Because of the increased tension and injury to her pelvic muscles, urine continues to be trapped in her vagina and leaks out spontaneously without warning. (9/26/24 Trial Tr. 9, 11.) The urine leakage occurs on a daily basis, at random unpredictable times, and varies in unpredictable volumes. (Id., 9.) The trapping of urine was objectively confirmed by Dr. Rosenblum through fluoroscopy. Additionally, bacteria collecting in the vagina causes Tigani to suffer frequent, highly painful urinary tract infections (approximately eight per year). (10/2/24 Trial Tr. 5.)

Ms. Tigani testified that she has daily pain and discomfort to her pelvic floor muscles from the injury. She requires invasive physical therapy that involves the physical manipulation of the muscles inside her vagina in an attempt to maintain the muscles in their damaged status. (10/1/24 Trial Tr. 36.) The damaged pelvic floor muscles cause painful constriction of the opening to Ms. Tigani's vagina. (10/1/24 Trial Tr. 42, 46.) This constriction causes pain during intercourse. (Id.) Ms. Tigani testified as to the dramatic change in her sexual relationship with her husband caused by the pain at the vaginal opening, as well as the problems with urine leakage. (10/1/24 Trial Tr. 44.) She also testified that it dramatically decreased the frequency of sexual relations, that she needed to put a towel down on the bed before engaging in intercourse, urinate prior to intercourse, shower and clean her vagina afterward, urinate again, and then take

medication. (Id., 45-46.) Ms. Tigani was thirty-two years old at the time of the cesarean-section injury, and three years into her marriage.

Ms. Tigani's injuries seriously impacted virtually all aspects of her daily experience and quality of life, including the loss of the ability to bear further children, which she looked forward to in her life. The evidence before the jury was that Ms. Tigani enjoyed being pregnant and engaging with her unborn child while carrying her. She also enjoyed the ultrasound appointments and the feeling of the baby inside her. As a result of the negligent performance of the cesarean section, Ms. Tigani lost the ability to enjoy these aspects of child bearing. Ms. Tigani had to experience the pregnancies of her other children through a surrogate. The jury awarded Ms. Tigani her surrogacy expenses for the carrying and the birth of her other three children.

Ms. Tigani was thirty-two years old at the time of the cesarean section and a healthy, active woman. (10/1/24 Trial Tr. 12.) She endured the above-described injuries for nearly ten years prior to trial and has a life expectancy of thirty-nine years. (10/2/24 Trial Tr. 35-36.)

At oral argument on this motion for remittitur, this court specifically asked defendants' counsel what award of noneconomic damages would not have been excessive or shocked the sense of justice. Defendants' counsel gave the court a figure for *total* noneconomic damages far below even the first noneconomic award of damages of $5 million. This attorney, however, was not present at trial to listen to and observe the

evidence offered. The jury, however, was present. It was present for all of the testimony and all of the evidence presented in this case and could evaluate the impacts of plaintiff's injuries on her ability to enjoy her life's activities, the physical injuries suffered by her, and the physical pain and suffering caused to her. After hearing the Court's instructions on the law regarding noneconomic damages and receiving a copy of that charge in the jury room, the jury unanimously agreed upon and entered the $29 million dollar award of noneconomic damages as fair, just and reasonable damages to compensate plaintiff for her noneconomic damages, injuries, and losses.

Moreover, in determining whether the noneconomic damages award in this case is excessive or shocks the sense of justice, this Court will not look to other verdicts to determine whether the present verdict was excessive or shocked the sense of justice. Our Supreme Court has been clear that each case must be assessed on its own, and that comparing one verdict to another is unwarranted. *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 58, 69–70 (2023), citing *Munn.* v. *Hotchkiss School*, 326 Conn. 540, 569, 578, 165 A.3d 1167 (2017).

This Court has reviewed the evidence in the light most favorable to sustaining the verdict. Based on the foregoing, this Court finds that the noneconomic damages verdict rendered in Tigani's favor in the amount of $29 million is not plainly excessive or exorbitant, and that such verdict falls within the necessarily uncertain limits of fair, just, and reasonable damages for physical injuries, physical pain and suffering, and the loss of

the ability to enjoy life's activities. This verdict does not shock the sense of justice, and while the amount of the verdict is substantial, this Court finds that it is no more substantial than plaintiff's injury. See *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 344, 430 A.2d 1 (1980) (verdict not excessive where jury could reasonably arrive at result reached and amount "no more substantial than the plaintiff's injury"). As the present verdict does not shock the sense of justice, there are no grounds upon which to set aside the verdict as excessive or remit the award of noneconomic damages to Ms. Tigani.

Accordingly, Westmed's and Dr. Elias' motion to set aside the verdict on the ground that it is excessive and that a new trial is warranted is denied as is their motion for remittitur of the verdict in favor of plaintiff.

## IV.

## CONCLUSION

Based on the foregoing, WestMed's and Dr. Elias' motion to set aside the verdict as well as their motion for remittitur are denied. Judgment shall enter in favor of plaintiff, Elizabeth Tigani, in accordance with the jury's verdict dated October 11, 2024, in the total amount of $30,374,811.98.

In separate decisions, this court will address the offer of compromise interest and postjudgment interest requested by plaintiff.

BY THE COURT:

Ozalis, J.

OZALIS, J.

Decision entered in accordance with the foregoing. 1/29/2025

J. Nich

J. NICHOLSON

COURT OFFICER

All counsel notified.